## PEOPLE v GODDARD

Docket No. 74750. Argued November 12, 1986 (Calendar No. 6).
Decided January 20, 1988.

Kenneth A. Goddard was convicted by a jury in the Alcona
Circuit Court, Joseph P. Swallow, J., of first-degree felony
murder. The Court of Appeals, BEASLEY, P.J., and R. B. BURNS
and MEGARGLE, JJ., affirmed in an opinion per curiam (Docket
No. 61849). The defendant appeals, contending that admission
of testimony regarding his prior statement during the commis-
sion of a similar crime was error requiring reversal.

In an opinion by Justice LEVIN, joined by Justices CAVANAGH
and ARCHER, and in which Chief Justice RILEY concurred
separately, the Supreme Court *held:*

Testimony by an accomplice concerning the defendant's in-
volvement in prior similar crimes was not admissible, and the
probable prejudice caused by its admission warrants reversal.
Nor was testimony by the accomplice concerning a statement
by the defendant made during the commission of the previous
crimes properly admitted in evidence, nor should it be admitted
on remand.

1. In this case, the jury was faced with a narrow question of
credibility. It was presented with two contrasting versions of
the crime, neither of which was inherently credible. The defen-
dant and the state's chief witness told conflicting stories, each
accusing the other of the crime. In this context, the prejudice
caused to the defendant by testimony of his prior breakings and
enterings, his shooting of a television set, and his statements
regarding what he would do if confronted during a breaking
and entering may well have tipped the balance against the
defendant.

2. Evidence of prior bad acts, to be admitted, must exhibit
some special quality or circumstance linking the evidence to
the crime charged. There must be substantial evidence that the

### REFERENCES

Am Jur 2d, Criminal Law §§ 1-3.

Use or admissibility of prior inconsistent statements of witness as
substantive evidence of torts to which they relate in criminal
cases—Modern state cases. 30 ALR4th 414.

defendant committed the bad act; the act must have a special quality or circumstance which would tend to prove the defendant's identity, motive, intent, opportunity, preparation, or knowledge or absence of mistake, accident, scheme, plan, or system in doing the act; one or more of the factors must be material to the determination of the defendant's guilt; and the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. The provision of a context for understanding a prior statement is not among the limited purposes for which evidence of a prior act may be admitted. The testimony in question was admitted to show intent. However, there were no similarities between the prior acts and the decedent's death sufficient to warrant admission. Even if a lesser showing of similarity is required where evidence is offered to prove something other than identity, there must be some showing of similarity. Thus, the testimony regarding the defendant's prior bad acts should not have been admitted.

3. A prior statement of general intent is not a prior act for purposes of MRE 404(b). The appropriate analysis is whether the statement is relevant and, if so, whether its probative value outweighs its potential prejudicial effect. In this case, the statement should not have been admitted, its probable prejudice outweighing its probative value.

Reversed and remanded for a new trial.

Justice LEVIN, joined by Justices CAVANAGH and ARCHER, additionally would hold that even if the probative value of the testimony outweighed its potential prejudicial effect, admission to show the defendant's intent was improper because the defendant never placed his intent in issue.

Chief Justice RILEY, concurring in part and dissenting in part, stated that the similar-acts analysis of *People v Golochowicz*, 413 Mich 298 (1982), should not be employed to determine the admissibility of a party admission.

Justice BOYLE, joined by Justice BRICKLEY, dissenting, stated that the testimony concerning a statement made by the defendant during the commission of a previous similar crime was relevant to the defendant's intent or motive during the commission of the crime in this case. Evidence of the prior similar acts was admissible to provide a context for the defendant's statement.

1. Evidence that a person previously has committed a crime is excluded where it is offered to prove that a person with such character is more likely to have committed the crime charged. Evidence of a statement by the defendant which would impli-

cate the defendant in a bad act other than the crime charged likewise is subject to exclusion as evidence of bad character. Such evidence may be admitted where there is substantial evidence that the defendant committed the bad act; the act involves a special quality or circumstance which would tend to prove the defendant's identity, motive, intent, opportunity, preparation, or knowledge or absence of mistake, accident, scheme, plan, or system in doing the act; one or more of the factors is material to the determination of the defendant's guilt; and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Where the evidence is admitted to establish identity, there must be a distinct and unique relationship between the like act and the crime charged to permit the inference that the defendant committed the crime. Where such evidence is admitted to establish the defendant's intent and motive, the commonalty of circumstances need not be so unusual and distinctive as to indicate that the crime was the handiwork of the accused. In addition, where the evidence is offered to show identity, intent, motive, lack of accident, or a criminal plan, one of the factors must be genuinely controverted.

2. In this case, that the defendant committed the prior bad act is not seriously in dispute. The evidence at issue was not admitted to establish identity, but to establish the defendant's intent or motive at the time of the murder, requiring a determination of whether the defendant's intent on the prior occasion had any tendency to make his intent during the commission of the crime charged more probable. In its opening statement and during cross-examination and its motion for a directed verdict, the defense placed the defendant's intent and motive in issue. In addition, evidence that the defendant's prior statement that he would shoot anyone interfering with a future breaking and entering to prevent apprehension was made during the course of a breaking and entering and evidence that it was accompanied by an act of shooting was indicative of an identifiable plan developed by the defendant and was more probative than prejudicial. Evidence of the prior burglaries and the shooting was properly admitted to provide a context for the statement.

Justice GRIFFIN took no part in the decision of this case.

135 Mich App 128; 352 NW2d 367 (1984) reversed.

1. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS — PRIOR STATEMENTS.
   A prior statement of general intent by a criminal defendant is not a prior act admissible under the Rules of Evidence; to be admitted, such a statement must be determined to be relevant,

and its probative value must outweigh its potential prejudicial effect (MRE 404[b]).

2. CRIMINAL LAW — EVIDENCE — SIMILAR ACTS — PRIOR STATEMENTS.
   Evidence of a defendant's prior bad act may not be admitted to provide a context for understanding a statement by the defendant made during the commission of the prior act (MRE 404[b]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Eugene Malanyn,* Prosecuting Attorney, and *Thomas C. Johnson,* Assistant Attorney General, for the people.

State Appellate Defender (by *Richard B. Ginsberg*) for the defendant.

LEVIN, J. Kenneth Goddard was convicted of felony murder for the shooting death of George Wissmiller. At the trial, the judge admitted in evidence the testimony of Michael Koski, who stated that six months before Wissmiller's death, in the course of one night, he and Ken had committed five breakings and enterings into various hunting lodges and cabins. Koski testified that during one of these breakings and enterings Ken drew a pistol and shot several times at a television set, and then said that if they "were ever approached that he'd fire once into the air and then fire at the people." The question presented is whether Koski's testimony was improperly admitted in evidence. We hold that it was, reverse the decision of the Court of Appeals, and remand for a new trial.

I

On August 17, 1980, a friend discovered Wissmiller's body. Wissmiller died from a single gunshot which passed through his chest, piercing his heart. Wissmiller was the longtime caretaker of the

Quart family's vacation residence and sometimes ranch. The property comprises approximately 850 acres in Alcona County. Wissmiller's body was discovered in the general vicinity of the caretaker's residence and the family's home.

Both Wissmiller's residence and the Quart family home had been burglarized. Quantities of clothing, bedding, and sporting equipment were missing. The telephone in Wissmiller's residence had been ripped out of the wall.

In determining responsibility for Wissmiller's death, the jury faced a narrow question of credibility. Defendant Ken Goddard and his father, Grant Goddard, Jr.,—the state's chief witness—told conflicting stories. Each accused the other of shooting Wissmiller.

According to Grant, Ken accidentally shot Wissmiller and then initiated the breakings and enterings. Grant testified that on August 13, 1980, Ken came to his father's home to go deer hunting. The two left Grant's home a little after noon, and drove to a deserted area to engage in target practice with Ken's .308 caliber rifle. Grant was armed with a .22 magnum rifle and a .38 caliber pistol. After practicing with the rifle and driving around for a bit without spotting any deer, they decided to go to the Quart property. The caretaker's residence and the family home looked deserted, and the two pulled into a trail that led into the Quart land. They decided to hunt deer across an open field. Grant testified that after he and Ken stepped out of Ken's Scout, they discussed the possibility of breaking into and entering the buildings if they found no one there.[1]

---

[1] Grant gave three different versions of when he and Ken first discussed the possibility of breaking and entering. Grant first said that he and Ken discussed the possibility after they pulled onto the Quart land. He then stated that the first time was after the two had

Upon reaching the vicinity of the caretaker's residence and the family home, Grant testified that he and Ken climbed on top of a root cellar—effectively a small hill covered with tall grass—to observe the area. They decided that if no one was home, they would break and enter. They observed the area for about fifteen minutes, and had just decided to move in when they heard a tractor approaching.

Grant testified that he recognized George Wissmiller—for whom he had worked some years ago—as the tractor's driver. Wissmiller parked the tractor and let one of his dogs, a small terrier, loose. The dog ran up to the root cellar and began circling and barking. Grant testified that Wissmiller walked past the root cellar, called his dog to him, and continued on several hundred yards to a small lake. He stayed by the lake for several minutes, and then began walking back along a different route.

Grant testified that as soon as Wissmiller appeared, he told Ken that he wanted to "get out of here." When Wissmiller began coming back from the lake, Ken said, according to Grant, that he wanted to see what he was doing. So, lying prone on top of the root cellar, and with both hands on the gun's forestock, Ken peered through the .308 rifle's telescopic scope. The rifle accidentally discharged, and Ken exclaimed, "I didn't mean to do it. The safety must have been off." Grant testified that Ken's hands were never near the trigger.

According to Grant, Wissmiller, who was then approximately one-hundred yards from the root cellar, took several staggering steps and collapsed.

hunted across the property and had actually reached the area of the caretaker's residence and family house. His third version, on cross-examination, was that the first discussion occurred immediately after they drove by the caretaker's residence and saw no indication that anyone was home.

By the time Grant and Ken reached him, he was already dead. The two dragged his body approximately thirty feet to a less conspicuous location.

Grant testified that Ken, upon discovering that Wissmiller was dead, suggested that the two continue with their plans to break and enter. Ken, with his father right behind, entered the caretaker's residence through an unlocked door. After taking a number of items, the two continued to the family home, which they broke into and searched.

Grant testified that he and Ken loaded the stolen items into Wissmiller's old pickup, and then drove it over to Ken's Scout.[2] The number of items necessitated two trips. Grant and Ken then returned to Grant's home.[3]

An initial confession by Ken corresponded exactly with his father's version of events.[4] Ken subsequently claimed that the confession was part of an agreed-upon plan with his father whereby Ken would shift blame from his father, who was then a fugitive from federal charges, to himself, who had no prior criminal record.[5] Ken testified

[2] According to Grant, after he and Ken were unable to find the pickup keys in the caretaker's residence, Ken was the one who searched Wissmiller's body, taking his keys and his wallet. Grant said that he was the one who covered Wissmiller's body with a blanket.

[3] On cross-examination, Grant recalled an event which he had omitted on direct examination—that Ken was the one who ripped the phone out of the wall of the caretaker's residence.

[4] Ken acknowledged that he made the confession.

[5] Ken testified that his father told him that with Ken's good record and his father's testimony of how the shooting was accidental, Ken would at most be sentenced to a year or two in prison.

Evidence corroborating Ken's story was kept from the jury. Most exculpatory was a letter written to Ken from his father after Ken was arrested. The letter stated:

Dear Ken. I got both of your letters. I think you must have the wrong idea of what is happening. The first thing, you were not going to make bond. For they were going to charge you with six more B and E's, Alcona County. You was [sic] going to get a lot of time, believe me. I tried through God to salvage

that in fact it was his father who shot Wissmiller, and that his father told him two different versions of the shooting. First, that the shooting was accidental, the father fired unintentionally from the top of the root cellar. Second, the father shot Wissmiller after Wissmiller discovered and recognized him.

According to Ken, the afternoon began as his father had testified. The two intended to go deer hunting and first engaged in target practice with Ken's .308 rifle. They next visited the Quart property. Here the stories diverge. According to Ken, there was no talk of breaking and entering. Ken had hunted deer on the Quart land a number of times previously, and had even constructed a deer blind near the property line. According to Ken, he and his father split up. Ken stayed in the blind with his dad's .22 magnum, while his dad took the .308 and moved down toward the residence area. Ken testified that several hours after his dad left he heard a single shot, which he assumed was his dad shooting at a deer. After waiting for some forty minutes, Ken began moving toward the area from which the shot had come. Upon reaching the

three lives, not just one. Yours, mine, and your grandfather's. [Grant Goddard, Jr.'s, father, Grant, Sr., was living with his son at the time of Wissmiller's death. Prior to the trial, Grant, Sr., left Michigan and was reportedly in Arizona. The testimony of both Grant, Jr., and Ken implicated Grant, Sr., in nothing more serious than aiding Grant, Jr., in getting rid of items stolen from the Quart property.] This slaying was a tragic accident. Your charge, thanks to a new Supreme Court ruling, just three days prior to your arrest, will result in a reduced charge of manslaughter. There is no way you will [get] one or two. Sit down and use your head and quit feeling sorry for yourself. If you don't think enough of me and your grandfather, then I indeed feel sorry for you. Now after you read this letter and still feel I don't love you, then I will do as you wish and not write again. It is up to you, my son, for I haven't changed in the way I feel about you. God bless and comfort and direct you. Love always, Dad.

residence area, he observed his father carting items out of the family residence.

His dad initially waved him away. When Ken came up to him, he said that there had been an accident, and that Wissmiller was dead. At that point, Ken told his father that he, Ken, would take the blame and that his father should run off. Ken testified that he and his father argued. Ken wanted to report Wissmiller's death; his father refused. Ken went into the caretaker's residence to call the police, and his father tore the phone off the wall.

According to Ken, he refused to help his father move Wissmiller's body, and his father moved it himself. Ken covered the body with a blanket, and his dad was the one who removed Wissmiller's keys and wallet. Ken testified that he had nothing to do with the breaking and entering—his father had already loaded Wissmiller's pickup truck with stolen items when Ken arrived, and Ken testified that after he learned of Wissmiller's death he was in such shock that all he wanted to do was leave. Ken blew up when his father insisted upon taking some guns. His dad had a large collection of guns —over one hundred—and Ken saw no reason to add to it.[6] They made only one trip with the pickup truck. Ken helped his dad transfer the stolen items to the Scout, and the two returned to Grant's home.

In summary, the jury was faced with a narrow question of credibility. In this context, the prejudice caused to Ken by Koski's testimony of Ken's prior breakings and enterings, his shooting at the television set, and his statement may well have tipped the balance against Ken.

---

[6] At least some of Grant's federal charges related to unlawful firearm possession.

## II

The prosecution persuaded the trial judge to admit Koski's testimony in evidence under MRE 404(b), which authorizes admission of a defendant's prior conduct to show "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . ."[7] Koski testified that on the night of February 15, 1980, he and Ken had committed at least five separate breakings and enterings.[8] In testifying to the particulars of their breaking into and entering the Silver Wolf Lodge, Koski stated that while they were in the lodge, Ken pulled out a pistol and shot two or three shots at a television set, and then said that if they "were ever approached that he'd fire once into the air and then fire at the people." The judge admitted Koski's testimony to show malice—to show that if Ken did shoot Wissmiller, he intended to do so.

We make an initial distinction between Koski's testimony regarding the prior breakings and enterings, and the shooting at the television set, and his testimony concerning Ken's statement. A state-

---

[7] Although the prosecution argued that Koski's testimony should be admitted to show only intent, and although the trial judge repeatedly instructed the prosecutor that he could only use Koski's testimony for the limited purpose of showing intent, the prosecutor's use of the testimony indicates that he intended the jury to infer, from Koski's testimony, that Ken was a generally bad person. In his closing, for example, the prosecutor referred to Koski's testimony that Ken had shot several times at a television set during the breaking and entering at the Silver Wolf Lodge. On the basis of this act, the prosecutor explicitly asked the jury to infer that Ken was a man of bad and violent nature who would readily have shot Wissmiller. This usage of Koski's testimony was improper, directly contrary to the judge's strict instructions, and indicative of the prosecutor's true purpose in introducing the evidence.

[8] Koski testified that he and Ken Goddard broke into the Silver Wolf Lodge, an unidentified building near the Silver Wolf Lodge, the Hawthorne Lodge, the Alpena County Lodge, and the Ten Buck Club.

ment of general intent is not a prior act for
purposes of MRE 404(b). As the statement of a
party opponent, the admissibility analysis involves
instead first determining whether the statement
was relevant, and second whether its probative
value outweighed its possible prejudicial effect.[9]

We first consider whether, under MRE 404(b),
Koski's testimony concerning the February 15
breakings and enterings and the shooting of the
television set was properly admissible. We con-
clude that it was not admissible, and that the
probable prejudice caused warrants reversal. We
then consider whether Koski's testimony concern-
ing the statement would be admissible on its own.
We conclude that it would not be, and hold that on
remand the judge should not allow Koski to testify
to Ken's statement. We further hold that even if
the probative value of Koski's testimony out-
weighed its potential prejudicial effect, admitting
it to show Ken's intent was improper because he
never placed his intent in issue.

III

Admitting Koski's testimony of the prior break-
ings and enterings was clearly improper. The prob-
able prejudice caused by allowing the jury to hear
of these prior crimes outweighed their probative
value. To allow admissibility, there must be some
"special quality or circumstance" linking the prior
bad acts to the crime charged. This Court declared
in *People v Golochowicz,* 413 Mich 298, 308-309;
319 NW2d 518 (1982), that to admit evidence of a
defendant's prior bad acts:

> (1) there must be substantial evidence that the
> defendant actually perpetrated the bad act sought

---

[9] MRE 401 and 403.

to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

There were no similarities between the February 15, 1980, series of breakings and enterings and the shooting at the television set testified to by Koski and the death of Wissmiller sufficient to warrant admitting Koski's testimony. The prior breakings and enterings and the shooting at the television are not significantly probative of an intent to kill. At none of these prior burglaries did Ken kill or shoot at another human being. The shooting of a television set is not sufficiently similar to shooting a human being to warrant admitting it into evidence. Directing force at an inanimate object does not translate into a willingness to kill a human being.

Nor are the prior breakings and enterings and the shooting at the television set significantly similar to the breakings and enterings in the Quart property to warrant admission in evidence. Other than the fact that they were all breakings and enterings, there were no similarities at all.[10]

[10] Showing that a defendant had committed the same sort of crime with which he is presently charged, e.g., a breaking and entering, is in itself an insufficient similarity. If sufficient, all prior crimes of the same classification as the pending charge would be admitted. The exception would swallow the general rule that evidence of prior bad acts is inadmissible. See *People v Schweitzer,* 23 Mich 301, 304-305

The February 15 breakings and enterings were committed all in one night, six months before Wissmiller's death. At none of these prior burglaries did Ken kill or shoot at another human being. During the prior burglaries Ken was accompanied by Koski, while at the Quart's property he was accompanied by his father. Further, the modus operandi of the February 15 burglaries differed from that of the Quart burglary.[11] The prior burglaries were a series committed in one night. The Quart burglary, according to the father's testimony, occurred midday and only after father and son, using deer hunting as a cover, had an opportunity to thoroughly explore and observe the property.

Even if a lesser showing of similarity is required where the prior bad acts are offered to prove something other than identity, some showing of similarity must be made. The prior bad acts to which Koski testified bore no similarity—other than that they were breakings and enterings—to the death of Wissmiller and the burglarizing of the caretaker's residence and the Quart's vacation residence. Koski's testimony of Ken's prior bad acts should therefore not have been admitted.[12]

The prosecution does not contend that the prior bad acts were similar. Rather than argue that the prior burglaries were similar—or relevant at all—to the present case, the prosecutor instead argues that Koski's testimony was properly admitted be-

---

(1871), *People v Lapidus,* 167 Mich 53, 57; 132 NW 470 (1911), *People v Pinkerton,* 79 Mich 110, 113; 44 NW 180 (1889), *People v Minney,* 155 Mich 534, 537-538; 119 NW 918 (1909), *People v Seaman,* 107 Mich 348, 357; 65 NW 203 (1895), and *Lightfoot v People,* 16 Mich 507, 510-511 (1868).

[11] Assuming Grant's version of events.

[12] We do not address the issue whether, when using prior bad acts to show a similarity other than identity, the prosecution need not make a strong showing of similarity. We note that here there is no similarity sufficient to warrant admission.

cause it included Ken's statement, made during the breaking and entering of the Silver Wolf Lodge, that if he and Koski were ever discovered in the course of a breaking and entering, Ken would first fire a warning shot into the air and then, if the person or persons kept coming, fire at him or them. The prosecution argues, "The link exists between the 'other acts' and the charge because the charged offense consisted of the defendant doing exactly what he said he was going to do."[13] Ken's statement, however, is just that—a statement, not a prior act. MRE 404(b) does not apply to a defendant's prior statements of intent. Rather, the appropriate analysis is whether the prior statement is relevant, and if so whether its probative value outweighs its potential prejudicial effect.[14]

Because the only "similarity" between the prior bad acts to which Koski testified and the crime charged is Ken's statement,[15] Koski's testimony of the five breakings and enterings and the shooting at the television set was improperly admitted. These prior crimes were not similar to the crimes charged here. Furthermore, even if it would have been permissible to allow Koski to testify to Ken's statement, Koski's testimony regarding the prior burglaries could not have been admitted to provide context for interpreting the statement. Testimony of a defendant's bad acts is admissible only for

---

[13] Plaintiff-Appellee's Brief on Appeal, p 9. See, generally, pp 6-9.

[14] Because the statement was made by a party opponent, it is not subject to the hearsay rule. MRE 801(d)(2).

[15] The prosecutor also argues, almost as an aside, that the February 15 breakings and enterings are relevant in that because Koski testified that Ken carried a gun on at least some of the breakings and enterings that night, that fact indicates that Ken was prepared to use the gun. Hence, the prosecutor would have us infer Ken was ready and willing to use a gun against Wissmiller. We find this link too attenuated to outweigh the probable prejudicial effects of Koski's testimony.

very limited purposes. Providing context for under-
standing a prior statement is not one of those
purposes.

The jury was presented with two contrasting
versions of Wissmiller's death. Neither was inher-
ently credible. Which version the jury chose to
believe depended largely on which witness the jury
found most believable. Koski's testimony was the
only evidence indicating that Ken had engaged in
prior bad acts.[16] Absent this testimony, the jury
may well have found Ken the more credible wit-
ness and chosen to believe his version of events
rather than his father's.[17] We therefore hold that
admission of Koski's testimony concerning the
breakings and enterings and the shooting of the
television set constitutes error requiring reversal.

IV

We further consider the question whether, on
remand, Koski should be allowed to testify to
Ken's statement. Because we believe the state-
ment's probative value is outweighed by the poten-
tial prejudice it may cause, we hold that Koski
should not be allowed to so testify.

The first step is determining the probativeness
of Ken's statement in deciding whether Ken shot
and intended to shoot Wissmiller. The circum-
stances surrounding the making of this statement
indicate that its probative value is low. The state-
ment reflects Ken's state of mind at the time he

[16] The father's testimony that he had engaged in prior breakings
and enterings with Ken, and a deputy's testimony that Ken possessed
a vehicle believed to be stolen, were objected to and the objections
were sustained, and at least in the latter instance the testimony was
stricken from the record.

[17] The jurors were informed of Grant, Jr.'s, prior criminal history
when they learned of the circumstances of his plea bargain.

made the statement in February of 1980.[18] Ken made the statement six months prior to Wissmiller's death. At the time he made the statement, it was completely hypothetical. The statement appears to be an exercise in machismo, one accomplice bragging to another about how tough he would be. Prior to this case Ken had no criminal record. So far as we can determine, he had never faced the actual possibility of shooting another human being. He did not know—could not know—how he would react in such a situation. Further, his statement was limited in its scope to that night's activities alone. Ken referred to somebody coming upon "us"—he and Koski. He did not hypothesize further as to what he would do six months hence. Additionally, according to the father's testimony, which the jury must have accepted in convicting Ken, Ken did not act as his statement indicated. The statement is irrelevant because the scenario which it covered—discovery in the course of a breaking and entering—never occurred. According to Grant, Ken's rifle discharged accidentally. Wissmiller was unaware that Grant and Ken were on the Quart land. Ken never fired a warning shot into the air. Ken's statement is, therefore, of minimal probative value in determining whether he shot and intended to shoot Wissmiller.

---

[18] An analogy to the *Hillmon* doctrine is instructive. The *Hillmon* doctrine is part of the state-of-mind exception to the hearsay rule, and provides that statements of future intent may be used to show the state of mind of the statement's maker at the time he made them. The statements may not be used to show the maker did in fact do what he said he intended to do, but only to show his state of mind at the time he made the statements. The trier of fact, weighing the circumstances surrounding the making of the statements, reaches its own conclusion as to whether in fact the maker's state of mind at the time he made the statements is probative in determining whether he actually did the alleged act. See *Mutual Life Ins Co v Hillmon,* 145 US 285, 295; 12 S Ct 909; 36 L Ed 706 (1892); 4 Weinstein, Evidence, ¶ 803(3)[04].

The second step is determining whether the potential prejudice to Ken caused by the jury hearing his statement outweighs its probative value. We believe that it does. The statement is potentially highly inflammatory.[19] The jury was faced with allocating blame where the two prime witnesses accused each other of being responsible. The jury then heard Ken's statement—that if someone came upon Koski and him, Ken would fire first into the air and then, if he kept coming, shoot at the person. Because Wissmiller died of a bullet wound, the statement provided a ready explanation for Wissmiller's death, although, as discussed above, the statement's probative value is low. Because the statement's probative value would be outweighed by the potential prejudice that it may cause, we conclude that on remand the trial court may not allow Koski to testify to Ken's statement.[20]

V

Even if the probative value of Koski's testimony outweighed its potential prejudicial effect, admitting it to show Ken's intent was improper because he never placed his intent in issue. As this Court said in *Golochowicz, supra*, p 316:

A genuine controversy exists concerning such matters when the defendant, either by counsel's

[19] Particularly since the jury could not be told the total context in which it was made—to do so would reveal that Ken and Koski were engaged in breaking and entering into the Silver Wolf Lodge.

[20] The record indicates that Grant Goddard, Jr., testified that he and Ken, in a conversation held several weeks before Wissmiller's death, discussed what they would do if they ever found themselves in a "tight situation." Grant Goddard, Jr., testified that he and Ken agreed that "if we ever got caught we felt like we would fight our way out of it." This testimony is much less prejudicial to Ken because it affects father and son equally. The jury was faced with the choice of deciding that either the father or the son killed George Wissmiller. The father's testimony, referred to above, affects both father and son; Ken's statement as testified to by Koski prejudices just Ken.

opening statement, a motion *in limine,* the nature of cross-examination by the defense, or evidence offered by the defense, has made one or more of them an issue actually disputed in the case.

Yet here Ken did not put the question of malice or intent in issue. Defense counsel did not argue that if the jury found Ken guilty of shooting Wissmiller, they could find, in the alternative, that the shooting was without malice, and therefore convict Ken only of involuntary manslaughter. While the judge instructed the jury on involuntary manslaughter, it is not clear why he did so. The record does not indicate that defense counsel requested the charge. *People v Beach,* 429 Mich 450; 418 NW2d 861 (1988), makes it quite clear that the judge was not obliged to give a manslaughter instruction. Because the defendant did not raise the question of intent, and did not argue that he could be found guilty only of involuntary manslaughter, we should not ignore error in admitting Koski's testimony on the basis of the unnecessary manslaughter instruction.

The people further argue that Ken's intent was properly put in issue by its own witness, Grant, who testified that the shooting was an accident. Grant was a res gestae witness, but he was also an accomplice. The prosecution was therefore not required to call him as a res gestae witness.[21] Furthermore, here the prosecution bargained with Grant to obtain his testimony. The prosecutor may not bargain for testimony, and then use that testimony to transform an uncontested matter into a contested question of fact, thereby creating an

---

[21] MCL 767.40; MSA 28.980; *People v Lytal,* 415 Mich 603, 610; 329 NW2d 738 (1982).

opening for introducing prejudicial evidence of the defendant's prior bad acts.[22]

We reverse the decision of the Court of Appeals, and remand for a new trial.

CAVANAGH and ARCHER, JJ., concurred with LEVIN, J.

RILEY, C.J. (*concurring in part and dissenting in part*). I agree with §§ I-IV of Justice LEVIN's opinion. I disagree with § V because Justice LEVIN has employed the similar-acts analysis of *People v Golochowicz,* 413 Mich 298; 319 NW2d 518 (1982), to determine the admissibility of defendant's own statement. Under Michigan Rule of Evidence 801(d)(2), a statement is excluded from the definition of hearsay if it is "offered against a party and is . . . his own statement . . . ." As such, assuming the statement to be relevant, and that none of the factors contained in MRE 403 or any other evidentiary objections are present, the statement is admissible. A similar-acts analysis is simply unnecessary in determining the admissibility of a party admission.

BOYLE, J. (*dissenting*).

I

Following a jury trial, the defendant was convicted of first-degree felony murder. MCL 750.316; MSA 28.548. The Court of Appeals affirmed. 135 Mich App 128; 352 NW2d 367 (1984). This Court granted leave to appeal to review defendant's con-

---

[22] If the prosecutor finds himself in a situation where he feels he must call a particular witness, yet part of that witness' testimony will call into question issues that the defendant has not himself called into question, the solution is to redact those portions of the testimony which create the conflict.

tention that the admission of Michael Koski's similar-act testimony constituted error requiring reversal. We disagree with defendant's contention and would affirm his conviction.

Defendant was charged with the murder of George Wissmiller, the caretaker of a summer home and hunting lodge in Alcona County. The trial was moved to Traverse City after publication of news stories that the defendant's father, the principal witness, had passed a polygraph examination.

At trial the father, Grant Goddard, testified that he and his son, Kenneth, had, at noon on August 13, 1980, returned for a second time to the Quart family lodge, to check on the feasibility of breaking and entering the building. Defendant carried a .308 caliber bolt action rifle, Grant Goddard carried a .38 caliber pistol in a holster inside his jacket, and both were carrying household rubber gloves. The father testified that he and the defendant, Kenneth, were on the roof of a root cellar surveying the area of the caretaker's home and the family residence in preparation for breaking in when they heard a vehicle approach and saw Mr. Wissmiller appear with one of his dogs. The dog ran barking toward the cellar. Wissmiller followed, past the root cellar through a clearing and down to the lake, while father and son lay on the top of the cellar.

Grant testified that Wissmiller turned and began to walk slowly back toward them, facing directly toward the root cellar. Ken said, "I'll take a fast look through the scope and see what he's doing." Grant testified further that the rifle went off and Ken said, "I didn't mean to shoot. The safety must have been off." While Grant acknowledged that Ken had never hunted with the safety off, he also said that he did not see Ken's hands

near the trigger and that he didn't think that Ken had raised the gun sufficiently to enable him to see through the scope. Thus, the thrust of the father's testimony regarding the shooting was that it was accidental. The pathologist testified that the cause of death was a single gunshot from a high velocity weapon that entered the side of the deceased and exploded his heart.

The defendant gave a statement after arrest that he accidentally shot Wissmiller. At trial, however, the defendant claimed that his father had shot the deceased, stating both that Grant said it was unintentional and that Grant said he shot Wissmiller after Wissmiller discovered him.

Ken also testified that he was not on the top of the root cellar, but was hunting in an area away from the buildings when he heard a shot. Grant testified that Ken and he together dragged the body a distance of forty feet,[1] that at Ken's suggestion they went ahead with the breaking and entering, that Ken ripped the phone off the wall in the caretaker's house, and that they both proceeded to loot both residences. He further testified that because there were too many articles to carry the distance back to their own truck, he and his son returned to George's body and took the deceased's wallet and the keys to his pickup truck. Grant testified that Ken drove the truck back to the north line fence and that they then made two trips to their own truck, leaving some items behind. He stated that he found $500 in the deceased's glove compartment, which he and the defendant divided.

Thus, while the senior Goddard's testimony provided support for a claim that the shooting was accidental, it fully implicated the son with regard to the breaking and entering.

---

[1] The victim was six feet tall and weighed 270 pounds.

The defendant testified that his sole reason for entering the Quart property was to hunt deer; that when he and his father split up, his father indicated that he was going to check if there was a back door to George Wissmiller's house; that approximately two hours later he heard a shot and assumed that his father had shot a deer; that when he went looking for his father, two hours after the shot, his father was already in the process of removing articles from the house; that he pleaded with his father to leave; that he took neither the deceased's keys nor his wallet; that his father moved the body by himself and that he didn't break in, didn't assist in putting anything in the truck, and didn't touch anything in the house. He also testified that he and Grant discussed his taking responsibility for the shooting because he would "probably get manslaughter . . . out of it."

Thus, the defendant's version of the incident was fully exculpatory, with regard both to the shooting and to the breaking and entering.

Michael Koski testified that he and defendant had committed a number of breakings and enterings of unoccupied hunting lodges in the same rural area; that Ken was armed at the time; that they both wore gloves; and that at the Silver Wolf Lodge, Ken pulled a pistol, shot into the TV, and said that if they were ever approached, he'd fire once into the air and then at the people. The testimony was preceded by a detailed instruction to the jury regarding the limited use of the evidence. The judge advised the jury that they must not assume that because the defendant did these acts "he must also be guilty of the offense that he is now charged with." He also repeated the definition of malice given in the opening instructions and stated:

Or if you as judges of the facts should find from the other evidence in this case that the Defendant fired the gun that killed George Wissmiller, then you may consider this evidence that you are about to hear only for the limited purpose of determining if he fired—if the Defendant fired—the gun at George Wissmiller with the intent to kill, with the intent to do great bodily harm, or with wanton and wilful disregard of the likelihood of a natural tendency of his behavior was to cause death or great bodily harm. The testimony you are about to hear can go only—only to that issue.

## II

The opinion for reversal would reverse the defendant's conviction solely on the basis of the admission of Michael Koski's testimony. This testimony was offered to establish the element of intent or malice required by a charge of first-degree felony murder. The trial court performed an analysis under MRE 404(b) and decided that the probative value of the offered testimony outweighed its prejudicial effect. We would affirm the decision of the trial court.

Evidence that a person has committed a crime is excluded where it is offered to prove that a person with such character is more likely to have committed the act in question. MRE 404(a). Thus, properly understood,

Rule 404(b) which admits evidence of other crimes, wrongs, or acts for purposes other than to show that a person acted in conformity with his character is not an exception to Rule 404(a) since 404(a) does not apply when criminal propensity is not used circumstantially as the basis for inferring an act. . . . Rule 404(b) is redundant; it appears as a rule, although the result would have been the same in its absence, to alert the reader to this

avenue of admitting evidence of other criminal acts, and to detail the most usual instances in which admissibility may be achieved. [2 Weinstein, Evidence, ¶ 404[08], pp 404-52 to 404-53.]

Professor Weinstein characterizes FRE 404(b), which is substantially identical to MRE 404(b), as a specialized rule of relevancy (that requires proffering counsel) to 1) identify the consequential fact to which the proffered evidence of other crimes, wrongs, or acts is directed, 2) prove the other crimes, wrongs, or acts, and 3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence. Evidence which passes muster up to the point, must in addition satisfy the balancing test imposed by Rule 403 which requires the probative value of the other-crimes evidence to outweigh the harmful consequence that might flow from its admission. *Id.,* p 404-58. *People v Golochowicz,* 413 Mich 298, 308; 319 NW2d 518 (1982).

The opinion for reversal distinguishes the testimony concerning the defendant's statement and testimony implicating the defendant in other breakings and enterings and in shooting at a television set. The opinion then posits that a statement by the defendant is not a prior act and therefore not subject to the general rule excluding evidence of a defendant's prior crimes. No authority is offered for this proposition, nor is it observed that in *Golochowicz,* itself, the similar-acts evidence consisted both of acts indicating possession of decedent's property and related events, including defendant's "admission" that he had killed the victim of the like act, *id.,* p 307.

In the concurring opinion, it is suggested that a party's statement is not subject to a "similar acts" analysis because under MRE 801(d)(2) it is admissi-

ble if offered against the party and is his own
statement. However, MRE 801(d)(2) is a rule defin-
ing hearsay, not relevance. Moreover, as the opin-
ion for reversal properly acknowledges, a party's
statement, in order to be admissible, must also be
relevant and not unduly prejudicial. MRE 401 and
403.

The analysis set forth under *Golochowicz, supra,*
for determining admissibility under MRE 404(b) is
a variation of the refined test for determining
relevancy described by Professor Weinstein. It is
designed to assure that the evidence "is probative
of some fact other than the defendant's bad char-
acter," *id.,* p 310. A statement by a defendant
which implicates him in a bad act other than the
crime charged is subject to use as evidence of bad
character as much as conduct evincing a prior bad
act. A similar danger exists that a defendant will
be convicted upon the basis of a statement that
only a "bad man" would make. Therefore, a defen-
dant's statement is not excepted from a proper
404(b) analysis when the statement implicates the
defendant in other bad acts. Indeed, our courts
have consistently analyzed the admission of such
evidence under the "similar acts" rule in this
jurisdiction. See, e.g., *People v Duncan,* 402 Mich
1; 260 NW2d 58 (1977) (prior incidents of bribery
were admissible in a trial to show the defendant's
intent on a charge of solicitation and conspiracy);
*People v Armentero,* 148 Mich App 120; 384 NW2d
98 (1986) (prior threats against a victim were
admissible to establish intent in killing the vic-
tim); *People v Burgess,* 153 Mich App 715; 396
NW2d 814 (1986) (the defendant's constant talk
concerning the perfect crime and his request that
another help him to accomplish a murder were
relevant on the issue of premeditation); *People v
Artuso,* 100 Mich App 396; 298 NW2d 746 (1980)

(statements by a defendant that he could deliver stolen merchandise were admissible in a trial for receiving and concealing stolen property). See also *United States v Johnson,* 525 F2d 999, 1006 (CA 2, 1975) (the defendant's statement was admissible to prove motive for the charged offense even if another crime was incidentally disclosed); 29 Am Jur 2d, § 321, p 369 (the general rule excluding evidence of other crimes and its exceptions extends to statements of intention). Cf. *State v Stephenson,* 361 NW2d 844 (Minn, 1985) (the defendant's prior threats were admissible in a trial for making terroristic threats).

The trial court did not abuse its discretion in determining that the disputed evidence was admissible under MRE 404(b). The standard which must be met in order for the evidence to be properly admissible is set forth in *People v Golochowicz, supra,* p 309:

> (1) there must be substantial evidence that the defendant actually perpetrated the bad act sought to be introduced; (2) there must be some special quality or circumstance of the bad act tending to prove the defendant's identity or the motive, intent, absence of mistake or accident, scheme, plan or system in doing the act and, in light of the slightly different language of MRE 404(b) we add, opportunity, preparation and knowledge; (3) one or more of these factors must be material to the determination of the defendant's guilt of the charged offense; and (4) the probative value of the evidence sought to be introduced must not be substantially outweighed by the danger of unfair prejudice.

Whether the first standard has been satisfied is not seriously in dispute.[2]

―――――――――――――――――

[2] It need not be proven beyond a reasonable doubt that the defen-

As to the second standard, the opinion for reversal concludes that there were *no* similarities between the other-act evidence testified to by Koski and the instant crime. We respectfully disagree. It is simply not true that, "Other than the fact that they were all breakings and enterings, there were no similarities at all." *Ante,* p 516. The prior breakings and enterings occurred in the same general sparsely populated area and were of buildings of the same category involved in the crime at bar—a hunting lodge or summer residence. The prior breakings and enterings as well as the instant one were committed while the defendant was armed and wearing gloves, and only after the defendant and his accomplice were convinced that the locations were deserted. Finally, the same sort of items—household goods and sporting equipment —were taken mainly during the course of all of the breakings and enterings.

Concededly, these similarities are not so strong as to justify admission of the evidence on the issue of identity. The threshold issue under 404(b) is whether the evidence is probative of some material fact. Thus, it is essential to identify the purpose for which the evidence is offered. Evidence of similar acts offered on the issue of identity are probative on that issue only if a distinct and unique relationship between the like act and the crime in question permits the inference that defendant was the perpetrator of the crime.

It is because of the combined value of those two factors, the unique and uncommonly distinctive

---

dant committed the other act. *People v Golochowicz, supra,* p 309, n 6. In the instant case, the defendant admitted the other breakings and enterings and aiming at the TV, although he denied hitting the TV and making the statement. In addition, Grant Goddard, Jr., testified that he and Ken had gone to the property armed, on a prior occasion, for the purpose of breaking and entering and that several weeks before the incident, the defendant had said, "If I ever get caught, I'll fight my way out of it."

style employed by the defendant in committing the
"substantially proved" uncharged similar offense,
and the same distinctive *modus operandi* employed
in the charged offense, that the jury is permitted
to infer, if it believes the evidence, that both
crimes were the handiwork of the same person,
the defendant. [*People v Golochowicz, supra,* p
311.]

In this case, however, the evidence was not
admitted to establish the identity of the defendant
as the perpetrator of the crime but to establish his
intent and motive in killing Wissmiller. As this
Court explained in *Golochowicz, supra,* trial courts
should be

stricter in applying [the] standards of relevancy
when the ultimate purpose of the [evidence] is to
prove identity or the doing by the accused of the
criminal act charged than they are when the
evidence is offered on the ultimate issue of knowl-
edge, intent or other state of mind. [McCormick,
Evidence (2d ed), § 190, p 452.]

To be sure, in each instance the trial judge must
determine whether the proffered evidence tends to
make a consequential fact more or less probable,
and where there is a high degree of similarity, the
evidence may have higher probative force. Where
as here, however, the issue is whether defendant's
intent on a prior occasion has "any tendency to
make the existence of any fact . . . more proba-
ble," MRE 401, the commonalty of circumstances
need not be so unusual and distinctive as to be like
a signature indicating the handiwork of the ac-
cused. See also *United States v Beechum,* 582 F2d
898, 911, n 15 (CA 5, 1978).

In the case at bar, the defendant's statement
that he would shoot if discovered, made during the

course of breaking and entering a hunting lodge, coupled with the shooting of a television set, was sufficiently similar to the shooting of Wissmiller immediately prior to the burglary of the Quart ranch to justify its admission on the element of defendant's intent.

*Golochowicz* further requires for the similar act evidence to be admissible to show intent, motive, identity, lack of accident, or a criminal plan that one of these factors is genuinely controverted. "A genuine controversy exists concerning such matters when the defendant, either by counsel's opening statement, a motion *in limine,* the nature of cross-examination by the defense, or evidence offered by the defense, has made one or more of them an issue actually disputed in the case." *Id.,* p 316.

During the opening statement in this case, the defense indicated it would show that the defendant went to the Quart residence in order to hunt deer and that it was his father who stated he might burglarize the ranch. Further, the defense contended that defendant's father intentionally killed Wissmiller because Wissmiller would be able to identify him and he was already a fugitive from federal justice. The defense further stated it would show that defendant did not take part in the breaking and entering.

Accordingly, the thrust of defendant's defense was that Grant Goddard, Jr., had the intent and motive to kill Wissmiller, and by negative implication that the defendant did not. By assigning intent to some other party, the defendant cannot foreclose evidence by the prosecution tending to show that defendant was the one who intended to accomplish the act. A contrary reading of the rule would render it nonsensical. *People v Chism,* 390 Mich 104, 118; 211 NW2d 193 (1973).

Moreover, during the cross-examination of Grant Goddard, Jr., the defense affirmatively put the intent of defendant in issue by eliciting from the witness that he did not see the defendant intentionally aim at Wissmiller.

In *People v Aaron*, 409 Mich 672; 299 NW2d 304 (1980), this Court held that felony murder could not be made out simply by proof that a homicide occurred in the course of an enumerated felony. Thus, as the trial judge in this case clearly recognized, the prosecution was required to present not only evidence of defendant's participation in the breaking and entering, but also evidence of a murder, that is, evidence of malice in that defendant either intended to kill or to do great bodily harm, or wantonly and wilfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm.

During the prosecution's case in chief, testimony of the examining pathologist that Wissmiller died of one gunshot to the heart was offered to satisfy the element of intent. Grant Goddard's testimony was offered to identify the defendant as the perpetrator. During the prosecutor's examination of Goddard, the intent of the defendant in aiming at Wissmiller was not affirmatively put in issue. Grant Goddard, Jr., was allowed to present his exculpatory version of the facts, but the prosecutor did not impeach that version at the time. Instead, it was defense counsel during cross-examination who emphasized, "At that time that the gun discharged . . . Ken had not pointed the gun at anything, had he? . . . And it wasn't being intentionally pointed at anything; is that correct?"

The opinion for reversal contends that the prosecutor was not required to call Grant Goddard as a res gestae witness because he was an accomplice. The opinion further contends that the prosecutor

may not admit the testimony of Grant Goddard in order to transform an uncontested matter into a contested question of fact and create an opening for introducing prejudicial evidence of prior bad acts.[3] Where the prosecutor feels that a particular witness must be called, and that witness' testimony will call into question issues that the defendant has not himself called into question, the opinion for reversal would require redaction of those portions of the testimony which create the conflict.

Such a suggestion would artificially parse the witness' testimony and conflict with the trial court's authority to govern the order of proofs. See MRE 611(a). It is, in any event, clearly not called for by the facts of this case.

The reason why an accessory need not be named and produced as a witness is because of the inclination or inducement of those close to the accused, by community of interest in the crime or relationship, to perjure themselves, if necessary in his behalf, and the incongruity of requiring the prosecution to make such witnesses his own. *People v Raider,* 256 Mich 131, 135-136; 239 NW 387 (1931). Where, as here, the accomplice implicates the defendant as the perpetrator, the reason for the rule excusing the production of accomplices does not apply. The accomplice is competent to testify for the prosecution subject to cautionary instructions if requested by the defendant. *People v McCoy,* 392 Mich 231; 220 NW2d 456 (1974).

It is well established that the prosecutor is

[3] This position seems to suggest that an issue cannot become genuinely controverted until after the defendant has presented his proofs. Such an assumption is clearly erroneous as recognized by this Court in *Golochowicz.* A genuine controversy may arise during the defendant's opening statement, a motion in limine, or during the cross-examination of prosecution witnesses as well as by evidence offered by the defense. *Golochowicz, supra,* p 316.

charged both with the duty to see that the law is
vindicated by seeing that the guilty are brought to
justice as well as the duty to see that the accused
receives a fair trial. *People v Duncan, supra,* p 17.
As the trial court recognized in determining
whether the element of intent was properly in
issue, "[t]he people are required to present excul-
patory as well as accusatory proofs."

To fashion a rule requiring redaction from an
accomplice's testimony of those portions tending to
exculpate a defendant from a crime would be
contrary both to the prosecutor's obligation to
insure that a defendant receives a fair trial and to
the fact-finding purpose of a trial. Such a harsh
rule is in any event not required by the facts of
this case because the issue of defendant's intent
was not controverted until the defense counsel
expressly cross-examined Grant Goddard, Jr., on
that precise issue. The intelligence in doing so is
clearly revealed in counsel's argument on the
motion for directed verdict, in which he contended
that the prosecution's proofs did not show that the
weapon was "intentionally aimed" and that the
failure of proof on the malice element required
dismissal of the murder charge under *People v
Aaron.*[4]

---

[4] Mr. Larkin argued as follows:

> It's our belief that if all the testimony as offered by the
> prosecution if viewed most favorably for the prosecution, that
> perhaps the Defendant could be found guilty of involuntary
> manslaughter resulting from an intentionally armed firearm.
> However, the one point or one item in that I don't believe they
> have even proved is that weapon or even offered testimony to
> the effect that that weapon was intentionally fired—I mean
> intentionally aimed. We have under *People v Aaron* that this
> malice requirement has to be addressed completely separate
> from the B and E. . . . I believe on that point, and getting away
> from the B and E, that we just have that malice issue and there
> is no showing at all, no question of fact that may be interpreted
> as malice, sufficient to be murder.

Nor is it dispositive as the opinion for reversal suggests that the defendant did not argue or object to the involuntary manslaughter instruction. These observations are not relevant to whether malice was an issue in the case. Malice was an element of the offense charged, and the testimony regarding defendant's intent to shoot if he was discovered during the course of an unlawful entry had a direct bearing on that question.[5] The prosecution's proofs identified defendant as the shooter; however, defense counsel's cross-examination of defendant's father's testimony made the intent of the defendant a doubtful element in the case. Moreover, the proofs offered by the defense suggesting that Grant Goddard, Jr., had the motive for killing Wissmiller and not the defendant, made both the identity of the killer and the intent of the shooter, "material in the sense that it was a matter genuinely controverted . . . ." *People v Golochowicz, supra,* p 319.

Finally, the probative value of the evidence substantially outweighed the danger of unfair prejudice. Defendant's anticipatory admission of what he would do if discovered is as logically probative on the issue of intent as a statement by a defendant after the fact of what his intent was at the time of the action in question.

Thus, it is generally accepted that threats by the defendant against a class of persons to which the deceased belonged is admissible against the accused even though the name of the deceased was not mentioned. 40 Am Jur 2d, § 317, p 587; *Brandley v State,* 691 SW2d 699 (Tex Crim App, 1985). The evidence offered by the prosecution in its case in chief clearly allowed the inference that the Goddards' presence had been or was about to be

---

[5] The propriety of the jury instruction on involuntary manslaughter is not before us.

discovered when Wissmiller was shot. Accordingly, the jury could reasonably infer from the evidence presented that Wissmiller came within the class of persons who were the subject of defendant's earlier statement.

The probative value of the prior breakings and enterings and the shooting of the television set become quite clear when examined as an explanation of the context in which the statement was made. The opinion for reversal provides no support for its statement that "[p]roviding context for understanding a prior statement is not one of [the limited purposes]" of similar act evidence under MRE 404(b).

Clearly, the fact that the statement was made during the course of a breaking and entering and accompanied by an act of shooting tends to prove that the statement was not a mere "exercise in machismo" but indicative of an identifiable plan developed by the defendant in case he was caught. Contrary to the conclusion of the opinion for reversal, the highest and best use of the circumstances surrounding the statement is as foundation for the statement indicating that the statement was made and the intent of the defendant when the statement was made. Such a use is not forbidden by the safeguards set forth in MRE 404(b).[6]

### III

In sum, the testimony concerning defendant's

---

[6] Only by separating the statement from its circumstances can the opinion for reversal make an arguable case for finding that admitting the evidence was more prejudicial than probative. Such a tactic would not be so objectionable if the opinion for reversal analyzed the offered evidence in terms of all its permissible uses and did not selectively choose characteristics of the prior act evidence which have no bearing on the case at bar.

prior statement was relevant to the defendant's intent or state of mind on the instant occasion. See *United States v Johnson, supra,* p 1006 (the defendant's statement was admissible to prove motives for the charged offense even if another crime was incidentally disclosed).

> [T]he statements were an admission as to intent and motive . . . . The statements were not admitted for the purpose of showing that the defendant acted in conformity with a particular character trait, but rather for the purpose of showing that he acted in conformity with a particular emotional state, jealousy, and that this provided a motive and intent for the crime. [*State v Wyss,* 124 Wis 2d 681, 712; 370 NW2d 745 (1985).]

See also *State v Stephenson, supra.* The evidence here was admissible not to show that the defendant acted in conformity with a character trait for violence, but rather to show his intent to shoot anyone interfering with a future breaking and entering to prevent his apprehension. The prior burglaries and shooting at the television set were properly admitted to provide context for the statement. Rule 404 does not preclude admission of such evidence for this purpose.

The other issues presented by the defendant are without merit for the reasons stated by the Court of Appeals.

The decision of the Court of Appeals should be affirmed.

BRICKLEY, J., concurred with BOYLE, J.

GRIFFIN, J., took no part in the decision of this case.