*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
April 2, 2020

v

DEANDRE HARRIS,

        Defendant-Appellant.

No. 345136
Wayne Circuit Court
LC No. 17-008762-01-FC

Before: M. J. KELLY, P.J., and FORT HOOD and BORRELLO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to two years' imprisonment for the felony-firearm conviction, as well as concurrent prison terms of 12 to 30 years for the AWIGBH conviction and one to five years for the felon-in-possession conviction, which were to be served consecutively to the felony-firearm sentence. For the reasons set forth in this opinion, we affirm defendant's convictions but remand for resentencing.

## I. BACKGROUND

This case stems from the October 6, 2017 assault of Troy Tisdale outside of a liquor store in Detroit, Michigan. Tisdale was selling movies and music from a cart outside of the liquor store that night, as he usually did, and he had been there that night since approximately 6:00 or 7:00 p.m. At some point that night, defendant and his brother, Derrick Howard-Larkin, arrived at the liquor store in a gray or silver car. Defendant was wearing a "burgundy hoodie," and Howard-Larkin was wearing a "grey hoodie." Defendant was the ex-boyfriend of Taisha Brunsun, and Brunsun was also the mother of Tisdale's three children. Harris had recently discovered that Tisdale was living with Brunsun.

Surveillance cameras outside of the liquor store captured events that took place once defendant and Howard-Larkin arrived, including the physical altercation involving defendant,

-1-

Howard-Larkin, and Tisdale. This surveillance footage was admitted as an exhibit at trial and played for the jury. Tisdale testified that defendant directed insults and threatening statements at him and that the confrontation became physical after defendant threw a glass beer bottle at Tisdale and then came at him with another bottle in his hand. Tisdale fought back, and Howard-Larkin then attacked Tisdale once Tisdale "got [defendant] on the ground." Tisdale continued to fight against both defendant and Howard-Larkin. At some point, according to Tisdale, he picked up a knife from the ground. Tisdale did not know where the knife came from. Orlando Simpson, who witnessed the incident, testified that defendant had the knife first and that Tisdale took it away from defendant during the course of the fight. Tisdale testified that he used the knife to try to get defendant and Howard-Larkin to back away. Howard-Larkin walked away, and Tisdale threw the knife down.

As the confrontation continued between Tisdale and defendant, Howard-Larkin returned. According to the surveillance video and Tisdale's testimony, Howard-Larkin walked up to Tisdale, aimed a handgun toward Tisdale's head, and fired. Tisdale ducked and avoided being shot. He grabbed Howard-Larkin, and a struggle over the gun ensued during which Howard-Larkin lost control of the gun. Tisdale testified that he heard two more gunshots at some point during this struggle with Howard-Larkin. Tisdale heard Howard-Larkin say, "Pick up the gun, pick up the clip, hurry up and shoot this motherf*ucker." The surveillance footage shows Howard-Larkin holding Tisdale down as defendant reappears on camera, pulls up his hood, and then holds a gun against Tisdale's upper back or shoulder. Then Howard-Larkin released Tisdale, and defendant and Howard-Larkin walked away. Tisdale walked away in the opposite direction. Tisdale also testified that defendant never fired the gun at him. Tisdale was eventually transported to Sinai-Grace Hospital with a gunshot wound to his left shoulder, and lacerations to his lip and elbow.

At some point after being shot, Tisdale called Brunsun and told her that defendant shot him. Tisdale asked Brunsun to come to the hospital, but Brunsun was afraid to leave her house because she was worried defendant would "come and shoot [her]" next. After speaking with Tisdale, Brunsun called 911, told the operator that Tisdale had shot the father of her children (Tisdale), and asked for an escort to her vehicle so she could leave her house.

In the early morning hours of October 7, 2017, Detroit Police Officer Lamar Kelsey went to Brunsun's home to follow up with her about the shooting. According to Kelsey, Brunsun had received "threatening calls" from defendant. Kelsey testified that while he was present at the home, Brunson received a telephone call from defendant. Kelsey further testified, "She had put her cellphone on speaker and I overheard the person on the other end state he was going to kill her and she was going to be on the news." A recording of the call played during trial, and Kelsey acknowledged that the recording did not include the words "I'm going to kill you." However, Kelsey also stated that there was more to the conversation than what was contained in the recording, and that defendant called several times before the recording began. Brunsun testified that she remembered a telephone call where defendant mentioned the news, but she did not remember defendant making a threat.

Defendant was convicted as previously noted. This appeal ensued.

## II. JUDICIAL BIAS

On appeal, defendant first argues that the trial court's questioning of particular witnesses created an appearance of advocacy and partiality against defendant, piercing the veil of judicial impartiality.

## A. STANDARD OF REVIEW

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015). However, defendant's claim of judicial bias is unpreserved for appellate review because defendant did not raise this issue in the trial court.[1] *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). We review unpreserved claims of judicial bias for plain error affecting substantial rights. *Id.*; see also *Stevens*, 498 Mich at 178-179, 180 n 6 (specifically stating that *preserved* claims of judicial bias that are successfully established on appeal are structural errors that are not subject to harmless-error review, and further concluding that plain-error review was inapplicable in that case because the issue was preserved).

"To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* The defendant bears the burden of demonstrating prejudice. *Id.* If these three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763 (quotation marks and citation omitted; second alteration in original).

## B. APPLICABLE LEGAL PRINCIPLES

When claiming judicial bias, a defendant "must overcome a heavy presumption of judicial impartiality." *Jackson*, 292 Mich App at 598 (quotation marks and citation omitted). To determine whether a trial judge's comments or conduct in front of the jury deprived a defendant of a fair trial, this Court considers whether the trial judge's conduct "pierce[d] the veil of judicial impartiality." *Stevens*, 498 Mich at 164.

> A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and

---

[1] As explained in more detail later in this opinion, defense counsel raised certain objections during the course of the discussions in the trial court that now form the basis for defendant's appellate judicial bias argument, but defendant never objected in the trial court on the basis of judicial bias. "An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993).

demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id.*]

"[I]n considering improper influence, the reviewing court must determine whether the judge's conduct was sufficiently severe and clear so as to create the appearance of bias against the aggrieved party." *Id*. at 171 n 3. This list of factors is nonexhaustive and "[r]eviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case." *Id*. at 172. "The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case." *Id*. "Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors." *Id*. at 171-172.

## C. ANALYSIS

In claiming that the trial court pierced the veil of impartiality in this case, defendant cites the trial court's conduct with respect to three witnesses and argues that the trial court's questioning of these witnesses "bolstered the prosecution's case."

First, defendant cites an exchange between the trial court and Tisdale during Tisdale's testimony. Before that exchange, Tisdale had testified that approximately two weeks before the incident that is the subject of the instant case, defendant had confronted him outside the liquor store and "pulled a knife out" on him. According to Tisdale, defendant was "aggressive" and "hostile" during this previous incident and was indicating that he had a "beef" with Tisdale or Brunsun. Subsequently, the trial court questioned Tisdale as follows:

> *The Court*: Did you get a good look at the knife that you say the defendant threatened you with or—in the previous incident?
>
> [*Tisdale*]: I mean, it was like a regular knife.
>
> *The Court*: Do you know if that was the same knife that you picked up off the ground?
>
> [*Tisdale*]: I don't know, I couldn't tell you that, I don't—I can't say if it was or if it wasn't.

Next, defendant refers to comments and questions made by the trial court during the testimony of Larshone Brown. Brown worked at the liquor store and testified that while he was inside the liquor store before the shooting occurred that night, he heard a customer wearing a "burgundy hoodie" say, "I was gonna kill him." According to Brown, the customer was referring to the "CD guy" who was shot that night, by which Brown meant Tisdale; Brown did not know Tisdale's name. Brown frequently answered the prosecutor's questions on direct examination with vague or noncommittal statements. The prosecutor questioned Brown about whether he "want[ed] to be here," and Brown responded, "No." During the course of the prosecutor's attempts to establish when Brown gave a statement to law enforcement, there was some confusion and the

-4-

court instructed both the prosecutor and defense counsel "to maintain your composure and your professional decorum and conduct yourself appropriately and, you know, there should be no tantrums." The following discussion occurred, and defendant on appeal relies on the trial court's final two statements to defense counsel in this discussion to support his argument that the veil of impartiality was pierced:

[*Prosecutor*]: And you didn't really want to talk to [the investigator], did you?

[*Brown*]: No.

[*Prosecutor*]: All right.

[*Defense Counsel*]: I'll object to the leading nature of the question.

*The Court*: Overruled.

[*Prosecutor*]: But you eventually talked to him; is that correct?

[*Brown*]: Correct.

[*Prosecutor*]: All right.

[*Defense Counsel*]: (Unintelligible).

*The Court*: All right. Your objection—

[*Defense Counsel*]: I don't know what.

*The Court*: [Defense counsel], your objection is duly noted, but in this instance I believe it's appropriate under the circumstance because [the prosecutor] is attempting, I believe to establish that this—I mean, you can look at the witness's demeanor, he's turned away from him, leaned away from him and he's simply just trying to establish for the record that this is a hostile witness who is here testifying under protest. So that's why I'm overruling your objection.

[*Defense Counsel*]: So just for the record, Your Honor, the witness's demeanor does not portray hostility—

*The Court*: You hold on just one moment, [defense counsel], you have a seat. I make my—represent my rulings as to what I observe. Now, every other witness, if you want to do this we can, every other witness that has come on the stand and testified and any—even Stevie Wonder could see, will be facing forward and engage directly. This witness is turned to the side, leaned away with his head turned away, mumbling, giving answers that are virtually inaudible and it's very clear from his body language, as well as the manner of speech that he does not want to be here and does not want to answer questions.

Now, I'm sure that won't change when you start asking him questions. The man doesn't want to be here and that's very clear, and I believe that [the prosecutor] is appropriately using leading questions to establish why he's conducting himself in this way. So, you know, this is a video courtroom and if at any point somebody wants to get ahold of the video and see exactly what the witness is doing, and that is consistent with my rulings in this regard, I'm sure they're free to do so. You may continue, [prosecutor].[2]

A short time later during Brown's testimony, the trial court sustained another objection by defense counsel to the prosecutor's leading questions about Brown's desire not to testify, but the trial court also overruled other similar defense counsel objections.

Additionally, defendant relies on the following questioning of Brown conducted by the trial court to support his appellate argument:

*The Court*: Sir, this question is from me, not from the jurors. Okay? Now, earlier you said that you heard the person in the burgundy sweatshirt say, "I was going to kill him;" is that correct?

[*Brown*]: Yes.

*The Court*: How did you know, if the only words he said w[ere], "I was gonna kill him," how did you [k]now he was talking about killing the CD man?

[*Brown*]: 'Cause it came up somehow.

*The Court*: What do you mean it came out somehow?

[*Brown*]: (Inaudible) came up.

*The Court*: I don't know what that means. I wasn't there and I can't put words in your mouth, but it came out in what way, through words, gestures, what are you saying?

[*Brown*]: (Inaudible)

---

[2] We note that although defense counsel objected during the course of this discussion, these objections were based on the contention that the prosecutor was improperly asking leading questions. Defense counsel's further argument to the trial court showed defense counsel's disagreement with the trial court's basis for concluding that Brown was a hostile witness and that the prosecutor would be permitted to ask leading questions. There is no indication in the record that defense counsel was attempting to raise the issue of judicial bias, and these objections therefore were insufficient to preserve the issue of judicial bias for appellate review. *Stimage*, 202 Mich App at 30.

*The Court*: All right. So let me ask you this, sir. How would you characterize that neighborhood where that store is, a good neighborhood, bad neighborhood, what kind of neighborhood is it?

[*Brown*]: It's not too good.

*The Court*: All right. And is it popular to be someone who talks to the police or cooperates with the police in that neighborhood?

[*Brown*]: I'm not sure.

*The Court*: Do they have a word for people who talk to the police in that neighborhood?

[*Brown*]: Not sure.

*The Court*: Have you ever heard the term snitch?

[*Defense Counsel*]: Your Honor, he said he's not sure.

*The Court*: Okay. And I'm asking another question, so your objection's duly noted and preserved. Have you ever heard the term snitch?[3]

[*Brown*]: I heard of it.

*The Court*: What's a snitch?

[*Brown*]: That's where you're talking to the police.

---

[3] As with defense counsel's other objections, this objection was not based on an alleged piercing of the veil of judicial impartiality. Defense counsel objected to the trial court's question on the ground that Brown had already provided an answer. But an objection to the propriety of a specific question does not constitute an argument that the trial court has pierced the veil of impartiality. The trial court is permitted to ask questions of witnesses. MRE 614(b). And a judicial ruling by itself, even if erroneous, generally does not demonstrate judicial bias unless there also exists deep-seated favoritism or antagonism. See *In re Contempt of Henry*, 282 Mich App 656, 680; 765 NW2d 44 (2009) ("The mere fact that a judge ruled against a litigant, even if the rulings are later determined to be erroneous, is not sufficient to require disqualification or reassignment."); *Jackson*, 292 Mich App at 598 ("Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible.") (quotation marks and citation omitted). We discern no sign of favoritism or antagonism, and we cannot glean from this record any indication that defense counsel was arguing that such existed or that the trial court's questioning otherwise constituted a piercing of the veil of judicial impartiality. Thus, as we have previously stated, defendant failed to preserve this issue for appeal. *Stimage*, 202 Mich App at 30.

*The Court*: Oh, so you do know a word for what people are called that talk to the police.

[*Brown*]: If that's what you call it.

*The Court*: Okay.  Now, is that a good thing to be known in that neighborhood over there as a snitch or a person who talks to the police?

[*Brown*]: Not good for no one.

*The Court*: All right.  And is that affecting you wanting to be here to talk in this case?

[*Brown*]: Yes.

*The Court*: Okay.  But despite that, are you doing your best to tell the truth about what you remembered and what you saw?

[*Brown*]: Yes.

*The Court*: Do you remember, word-for-word, everything that was said between you and the person with the burgundy sweatshirt?

[*Brown*]: No.

Finally, defendant challenges the following exchange between the trial court and Brunsun that occurred after questioning by the prosecutor and defense counsel:

*The Court*:  You indicated that at the time—at some point you were trying to keep—you would make up excuses not to go to the Grand Crew Liquor Store because you were trying to keep [defendant] and Mr. Tisdale separated?

[*Brunsun*]:  Yes.

*The Court*: At what point in time was this?

[*Brunsun*]: I'm not for sure exactly the dates, but I know that it was during the time that after [defendant] had moved out and [Tisdale] was there.

*The Court*: Okay.  How long after [defendant] moved out did [Tisdale] move in?  Or after [defendant] was put out 'cause you said he didn't move out, you put him out.  How long after [defendant] was put out did [Tisdale] move in?

[*Brunsun*]: I want to say a couple months, maybe two at the most.

*The Court*: Maybe two months at the most?

[*Brunsun*]: Maybe two months.

*The Court*: Now, during that period when you put [defendant] out, you moved [Tisdale] in, were you still romantically involved with [defendant]?

[*Brunsun*]: Yes.

*The Court*: And how did you facilitate still being romantically involved with [defendant] if [Tisdale] was living in the home?

[*Brunsun*]: [Defendant] would go get a room.

*The Court*: So by get a room you mean a hotel room?  So you would spend time at a hotel with [defendant] while [Tisdale] was living in the home with the kids?

[*Brunsun*]: Yes.

*The Court*: To your knowledge, did [defendant] and [Tisdale] become aware that you were still romantically involved with [defendant] while [Tisdale] was living in the home, to your knowledge?

[*Brunsun*]: Yes.

*The Court*: When did that happen?  When did they figure out that you were dealing with both of them?

[*Brunsun*]: I think [defendant] had—[defendant] found—I want to say [defendant] said something to me first, 'cause he worked right around the corner and I guess him passing the house or he was passing that store he saw [Tisdale] and he mentioned it to me.

*The Court*: When was that?

[*Brunsun*]: I'm not for sure of the date.

*The Court*: Okay.  Well, the shooting happened in October, October 6th, early October.

[*Brunsun*]: (Inaudible).

*The Court*: So would it be after Labor Day—

[*Brunsun*]: Maybe September, so maybe September he had mentioned it to me.  That was the last time I seen [Tisdale] (inaudible).

*The Court*: Okay.  So when [defendant] mentioned it to you that, you know, [Tisdale] was living in the house, was he happy about it?

[*Brunsun*]: I'm sorry?

-9-

> *The Court*: When [defendant] mentioned to you that he was aware that you had [Tisdale] over there in the house, was he happy about it?
>
> [*Brunsun*]: No.

In reviewing defendant's claim of error, we review the cumulative effect of all of the above instances of allegedly improper judicial conduct under "the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole." *Stevens*, 498 Mich at 172. "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Id*. at 171.

Although "judicial misconduct may come in myriad forms," *id*. at 172, defendant's argument in this case is based on his claim that the trial court's questioning of the above witnesses was improper because it bolstered the prosecution's case.

As previously stated, a trial court is generally permitted to question witnesses. *Id*. at 173; MRE 614(b) ("The court may interrogate witnesses, whether called by itself or by a party."). "[T]he central object of judicial questioning should be to clarify," and it is therefore "appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich at 173.

In this case, beginning with defendant's reliance on what could fairly be understood as the trial court's reprimand of defense counsel during the prosecutor's questioning of Brown, it is evident from the record that defense counsel was frustrated with the trial court's rulings, and it seems that the trial court permitted defense counsel's comments to provoke its own outburst. The trial court's response certainly should have been more restrained and devoid of sarcasm. Presuming the trial court's response to defense counsel to have been viewed as hostile, nevertheless, "[c]omments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598. "Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Id*. (quotation marks and citation omitted).

Again, presuming the language used by the trial court to reprimand defense counsel as improper, when viewing the totality of the record, these comments represented, at most, an isolated instance. Reviewing the totality of the record we cannot glean from the trial court's presumptive improper verbiage that such language, by itself demonstrated "deep-seated favoritism or antagonism" that reflected an inability to exercise fair judgment. *Jackson*, 292 Mich App at 598. Rather, the verbiage represented the frustrated musings of the trial judge. To that conclusion, it can be concluded after reviewing the record that the trial judge appeared equally frustrated with the state's advocate during these proceedings. What is missing from these exchanges however, is evidence of the trial court's language piercing the veil of impartiality.

As to defendant's objections to the trial court's questioning of witnesses, we conclude that the trial court's questioning of Tisdale, Brown, and Brunsun was intended to clarify so as to "produce fuller and more exact testimony." *Id*. However, it also appears that the issues on which

the trial court sought clarification were generally of nominal consequence and in some instances, such as the questioning about how Brunson carried on her romantic entanglements, were irrelevant. The trial court's tendency to interject itself into the fray of the proceedings—especially regarding seemingly salacious details—is better explained as a judicial sideshow rather than a trial court tipping the scale of justice in favor of the State.

Nonetheless, it is clear from our review of the record that some of the trial court's interventions were beneficial to defendant and that, on the whole, the trial court's interjections were generally neutral. We do not discern, under the totality of the circumstances, any general tendency on the part of the trial court to favor one side over the other such that the judge created an appearance of advocacy or partiality against a party that was "reasonably likely" to have influenced the jury. *Stevens*, 498 Mich at 164. Rather, the trial court appeared at times to be too concerned with satisfying its own curiosity, contrary to the proper role of a judge conducting a jury trial. As our Supreme Court explained in *Stevens*:

> Judicial questioning, nevertheless, has boundaries. The Michigan Code of Judicial Conduct states:
>
> > A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto. . . . In addressing counsel, litigants, or witnesses, the judge should avoid a controversial manner or tone. A judge should avoid interruptions of counsel in their arguments except to clarify their positions, and should not be tempted to the unnecessary display of learning or a premature judgment. [*Stevens*, 498 Mich at 174, quoting Code of Judicial Conduct, Canon 3(A)[12] (ellipses in original).]

Accordingly, defendant has failed to demonstrate plain error. Moreover, even if we were to presume that error occurred, we conclude that defendant has failed to show that the error affected the outcome of the proceedings in light of the relative insignificance of the trial court's interventions, the lack of any indication that the trial court favored one side even if it would have been better had the trial court not intervened as frequently, and the overwhelming evidence of defendant's guilt.

Defendant additionally argues in the alternative that his trial counsel was constitutionally ineffective for failing to object to the above alleged instances of judicial bias. "To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012).

As we have concluded, it does not appear from the record that the trial court's questioning of three witnesses influenced the result of the proceedings, considering the overwhelming evidence of defendant's guilt that included surveillance video and Tisdale's testimony. Moreover, the trial court instructed the jury (1) that the court's comments, rulings, questions, and instructions were not evidence; (2) that the court's comments and rulings were not intended to influence the jury's vote or express a personal opinion on the case; and (3) that if the jury believed that the judge held an opinion about the case, the jury was to disregard that opinion. Therefore, defendant has not demonstrated that but for defense counsel's failure to object on the ground of judicial bias, there is a reasonable probability that the result of the trial would have been different. *Id*. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland v Washington*, 466 US 668, 700; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

### III. EVIDENCE THAT DEFENDANT THREATENED BRUNSUN

Defendant next argues that the trial court abused its discretion in admitting evidence that defendant threatened to kill Brunsun following the October 6, 2017 assault on Tisdale. Defendant refers to the evidence that Kelsey overheard a telephone call in which defendant told Brunsun that he was going to kill her and that she was going to be on the news. On appeal, defendant argues that this evidence was inadmissible under MRE 404(b)(1), MRE 401, and MRE 403.

"A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017) (citation omitted). "However, whether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo." *Id*. "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018) (quotation marks and citation omitted).

As an initial matter, the evidence challenged by defendant concerns evidence of a statement that he allegedly made, rather than other bad *acts*, and MRE 404(b) is therefore inapplicable to our analysis. "[A] prior statement does not constitute a prior bad act coming under MRE 404(b) because it is just that, a prior statement and not a prior bad act." *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989), aff'd 437 Mich 149 (1991); see also *People v Goddard*, 429 Mich 505, 518; 418 NW2d 881 (1988) (opinion by LEVIN, J.) (explaining that a defendant's statement "is just that—a statement, not a prior act" and that "MRE 404(b) does not apply to a defendant's prior statements of intent"); *Goddard*, 429 Mich at 523 (RILEY, C.J., concurring in part and dissenting in part) (concurring in the relevant portion of Justice LEVIN's opinion). When a defendant's statement is at issue, "the appropriate analysis is whether the prior statement is relevant, and if so whether its probative value outweighs its potential prejudicial effect." *Goddard*, 429 Mich at 518 (opinion by LEVIN, J.); see also *Rushlow*, 179 Mich App at 176 ("[T]he relevant inquiry is whether the admitted statement is relevant.").

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, [the] rules [of evidence], or other rules adopted by the Supreme Court." MRE 402.

In this case, evidence showing that defendant threatened Brunsun demonstrated an attempt by defendant to intimidate a person who had been intimately involved with both defendant and Tisdale and who could potentially provide information to law enforcement that would tie defendant to the crime, thus reflecting consciousness of guilt. This evidence was at least marginally relevant. See *People v Sholl*, 453 Mich 730, 740; 556 NW2d 851 (1996) ("A defendant's threat against a witness is generally admissible. It is conduct that can demonstrate consciousness of guilt."); *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010) ("Evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt."). "[I]t is for the jury to determine the significance of a threat in conjunction with its consideration of the other testimony produced in the case." *Sholl*, 453 Mich at 740.

Furthermore, evidence that defendant threatened to kill Brunsun also supported the notion that defendant was upset with Brunson and Tisdale after they began living together, providing a motive for defendant's assault on Tisdale. "Motive is that which incites or stimulates a person to do an act." *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997) (quotation marks and citation omitted). Evidence of motive is admissible to help explain what may otherwise appear to be a random act of violence. *Id*. at 108-110. Hence, the evidence of defendant's threat was also relevant on the basis of showing his motive for attacking Tisdale.

However, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. From the record we glean none of the dangers cited in MRE 403. In the context of MRE 403, "prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *Schaw*, 288 Mich App at 237 (quotation marks and citation omitted). *Unfair* prejudice "refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v McGhee*, 268 Mich App 600, 614; 709 NW2d 595 (2005) (quotation marks and citation omitted). "[E]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Schaw*, 288 Mich App at 237. The evidence at issue here did not inject any extraneous considerations into the trial, *McGhee*, 268 Mich App at 614, and did not present any risk of being given "undue or preemptive weight," *Schaw*, 288 Mich App at 237. Therefore, the evidence was not unfairly prejudicial. Its probative value was not "substantially outweighed" by any "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Accordingly, the trial court did not abuse its discretion by ruling that the evidence was admissible.

## IV. SCORING OF PRIOR RECORD VARIABLES (PRV)

Next, defendant argues that he is entitled to resentencing because the trial court erroneously assessed 50 points for PRV 1 when it should have been assessed 25 points, and five points for PRV 2 when it should have been assessed 10 points. The prosecution properly concedes error regarding these scoring issues.

-13-

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citation omitted).

PRV 1 is contained in MCL 777.51, which indicates that 50 points are to be assessed if the "offender has 2 prior high severity felony convictions," MCL 777.51(1)(b), and that 25 points are to be assessed if the "offender has 1 prior high severity felony conviction," MCL 777.51(1)(c). As pertinent to the issue before us in this appeal, a "prior high severity felony conviction" is defined for purposes of this statute as a "felony under a law of the United States or another state corresponding to a crime listed in offense class M2, A, B, C, or D." MCL 777.51(2)(b).

PRV 2 is to be assessed five points if the "offender has 1 prior low severity felony conviction," MCL 777.52(1)(d), and 10 points if the "offender has 2 prior low severity felony convictions," MCL 777.52(1)(c). As pertinent to the issue before us in this appeal, a "prior low severity felony conviction" is defined for purposes of this statute as a felony under a law of the United States or another state that corresponds to a crime listed in offense class E, F, G, or H." MCL 777.52(2)(b).

At defendant's sentencing hearing, the prosecutor argued that 50 points, rather than 25 points, should be assessed for PRV 1 because defendant had previously been convicted in West Virginia of "malicious wounding" and "attempt to commit a felony with that felony being, again, malicious wounding." The prosecutor argued that the crime of malicious wounding in West Virginia was "equivalent [to] great bodily harm in the State of Michigan." Defense counsel objected and argued, "I don't believe that the attempt to commit a felony would constitute [a] high severity offense." The trial court agreed with the prosecutor and assessed 50 points for PRV 1. The trial court also reduced defendant's score under PRV 2 from 10 points to five points since the attempt conviction had previously been counted under PRV 2.

Assuming without deciding that West Virginia's crime of malicious wounding corresponds to Michigan's crime of AWIGBH,[4] the trial court erred by assessing 50 points for PRV 1 on the ground that a conviction in another state for a crime the court believed to be equivalent to an attempt to commit AWIGBH in Michigan constituted one of the prior high severity felony convictions used for purposes of scoring PRV 1. As our Supreme Court has explained:

> Because assault with intent to do great bodily harm is a class D offense, [MCL 777.16d,] and an attempt to commit a class A, B, C, or D offense is a class E offense, the defendant's prior conviction for attempted assault with intent to do great bodily harm was a class E offense. MCL 777.19(3)(a). The defendant's prior class E offense should have been treated as a "prior low severity felony conviction,"

---

[4] See *People v Crews*, 299 Mich App 381, 391; 829 NW2d 898 (2013) (defining the term "corresponding," as used in MCL 777.51(2)(b), to mean "similar or analogous") (quotation marks omitted).

scorable under PRV 2. MCL 777.52. [*People v Wright*, 483 Mich 1130; 767 NW2d 447 (2009).]

Reducing PRV 1 to 25 points, and increasing PRV 2 to 10 points, changes defendant's total PRV score from 75 points to 55 points. This reduction causes defendant's PRV level to change from F to E. MCL 777.65. When combined with defendant's total OV score of 65 points, the reduction to a PRV score of 55 points changes defendant's minimum sentencing guidelines range from 38 to 152 months to 34 to 134 months. MCL 777.65; MCL 777.21(3)(c).[5] Because correcting the trial court's erroneous scoring of PRV 1 and PRV 2 alters defendant's appropriate guidelines range, defendant is entitled to resentencing. See *People v Francisco*, 474 Mich 82, 92; 711 NW2d 44 (2006).

Defendant's convictions are affirmed. However, we remand to the trial court for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Stephen L. Borrello

---

[5] Defendant was sentenced as a fourth-offense habitual offender.