*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAVION TASHAWN DAVIS,

        Defendant-Appellant.

UNPUBLISHED
February 10, 2026
12:20 PM

No. 371055
Ingham Circuit Court
LC No. 22-000275-FC

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to commit murder, MCL 750.83,[1] and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant, who was 18 years old when these offenses were committed, was sentenced to 40 to 80 years' imprisonment for first-degree murder, 25 to 60 years' imprisonment for assault with intent to commit murder, and two years' imprisonment for each felony-firearm conviction. On appeal, defendant contends that there was insufficient evidence of identification to convict defendant of first-degree murder, the trial court improperly admitted irrelevant other-acts evidence, and the forensic pathologist's opinion regarding the manner-of-death invaded the province of the jury. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On January 10, 2022, at approximately 5:00 p.m., the victim, 19-year-old Elijah Brooks, was shot at 724 North Pennsylvania, known as The Bricks Apartments. Specifically, Courtney Norris was in a romantic relationship with the victim since the fall of 2021. On the day of the shooting, Norris drove to Vermont Street in her gold minivan with her 10-year-old son and picked the victim up in north Lansing. They drove to a bank and Eric's Market. Norris used her phone

---

[1] Defendant was convicted of assault with intent to commit murder of Courtney Norris. He was acquitted of assault with intent to commit murder of Norris's 10-year-old son.

and made an online appointment for her son with urgent care, but there was a two-hour wait time. The victim asked to be taken to The Bricks apartment building to meet some friends. The apartment building was located down the street from Eric's Market.

As Norris pulled into the apartment complex, the victim was trying to reach a person called "Phatz" on Facebook Messenger. Norris pulled into a handicap parking spot right in front of the apartment door but located in the back of the apartment building. Norris was the driver, the victim was in the passenger seat, and Norris's son was in the backseat. They sat in the parking lot for 10 to 15 minutes. The victim tried to contact another person on Facebook Messenger. He used Norris's phone because the speaker on the victim's phone did not work. Norris received notice that the wait time at urgent care was reduced to 20 minutes. Norris told the victim that she had to leave. The victim knew a few people that lived in the apartment building and said that he was going inside. Norris told the victim that she would wait for him to get inside the building because it was cold. Alternatively, she could take the victim to his mother's home because she lived down the street.

The victim got out of the minivan and walked into the building through the doors while wearing headphones and looking down at his phone. An apartment door underneath the stairs and to the right opened, and defendant appeared with a black handgun drawn. Norris heard shots "go off" and saw the victim fall. Then, she locked eyes with defendant, and he began to shoot at her minivan. Norris backed the minivan out and called 911.

In the 911 call, Norris reported: (1) the shooting of the victim, (2) the location of the shooting on the main floor of the apartment building in the back, (3) the shooter as defendant, (4) she was shot at in her minivan by defendant, and (5) she drove away. Norris also identified the apartment from which defendant came before the shooting, specifically, the one located to the right underneath the stairs. Norris identified the clothing that defendant was wearing, his complexion, and the type of black handgun that he had.

Norris opened her minivan door to try to get a better view of what happened. Although Norris and her son were not shot, the driver's side mirror of Norris' minivan was damaged in the shooting. Norris went to her grandmother's home. The police retrieved her from there and took her to the station. Norris gave the police consent to search her van and her cell phone. The victim had used Norris's phone because his speaker did not work. He could only send texts and leave messages on his own phone. The victim would use his own Facebook Messenger account to make video calls. Because the victim logged into his Facebook account on Norris's phone, she was able to provide screenshot photographs from the account to the police. Through the victim's Facebook account, Norris was able to give the police threatening audio messages sent to the victim by defendant. Norris knew defendant sent the messages because of the Facebook profile associated with the account. Previously, defendant and the victim were friends, but they were not any longer.

Norris testified that she had previously seen two pictures or videos of defendant. Additionally, Norris claimed that she met defendant in person when she worked at a youth center and he came in. At this center, Norris sat next to defendant but did not speak with him much. She could not recall the timeframe of their meeting. Norris also claimed that her prior coworker was defendant's probation officer. Norris indicated that she could identify defendant from the previously viewed video and profile picture. Norris described the shooter as a mixed race, light

skinned male with long afro hair and a regular build. The shooter was shorter than the victim or approximately 5' 8". Norris testified that she knew defendant was the shooter from his Facebook profile and video with the victim. She also identified defendant in court as the shooter. Norris acknowledged that she viewed a photographic lineup at the police station. Additionally, before the shooting, Norris did not know where defendant lived.

At trial, Norris also identified video from Eric's Market and the apartment complex that corroborated her testimony.

Before cross-examination, the parties advised the court of two stipulations to be placed on the record before the jury. The parties agreed to strike the testimony that defendant was on probation because it was incorrect. Additionally, the parties stipulated that defendant had never been housed at the youth center, and this disparity would be addressed through impeachment evidence by the defense. On cross-examination, Norris testified that she gave the police photographs from the victim's Facebook account. The victim had not arranged to meet defendant at the apartment building; he was supposed to meet a person identified as "Phatz." When the victim left the van, Norris eventually recalled asking if the victim would be safe. She just wanted to ensure that he could enter the apartment building because it was cold. The victim responded that the only person he had a problem with was defendant. Norris did not see any threatening texts directed to the victim except from defendant.

Norris insisted that she could see the shooting from the parking lot, that defendant was the shooter, and that she locked eyes with defendant. However, Norris also acknowledged that she was scared, frantic, and trying to drive away quickly.

When interviewed by the police, Norris viewed a photographic lineup. Despite being instructed that she need not identify anyone in the lineup, Norris identified someone other than defendant. Norris attributed her incorrect selection to the state of mind that she was in at that time. Additionally, Norris might have told the police that she was unsure of who the shooter was. Norris continued to assert that she had previous contact with defendant at a detention home or youth center. In light of the stipulation that defendant was not on probation, Norris now "guess[ed]" that she had never met defendant in person.

On redirect examination, Norris affirmed all the information that she gave to the 911 operator. Specifically, she described the shooting location, the victim's name, the main floor of the apartment building, the number of shots fired, the location of the apartment where the shooter came from, the shooter's complexion, the shooter's gun, the shooter's hair, the shooter's black pants, and the shooter's name as Davion. Norris further told the interviewing detective that the shooter looked like defendant and that he also shot at Norris and her son. In court, Norris stated that defendant's eyes and face looked "the same" as the shooter. Defendant's hair, now in braids at trial, did not change her opinion. Additionally, defendant came from the apartment located under the stairway. And, when shown the photographic lineup, Norris opined that the person she misidentified nonetheless resembled defendant. The hair, complexion, and face shape were consistent with defendant's appearance. Despite that lineup identification, Norris testified that defendant, as she identified him in the courtroom, was the individual that shot the victim and shot at Norris and her son. When the victim left the van, Norris did not know that he had a gun.

On the date of the shooting, Taviana Shakoor, then 19-years old, was staying at Bricks' apartment number 2, occupied by her mother Toni Beal. Beal resided at that apartment for two years with her children, who were then approximately 10 and 11 years old. Also at that time, defendant was Shakoor's boyfriend of a year, and he had a Facebook page with the name "Lul Dardi." The page had defendant's picture with long afro hair. Defendant also had a skull tattoo on his right hand. Shakoor lived with her father, but was staying at her mom's Bricks' apartment to care for her siblings while her mom worked out of town. Shakoor identified her mother's apartment as being right "underneath the staircase."

Defendant stayed at the apartment with Shakoor and the children for those two weeks. The couple stayed in the apartment's main bedroom. Shakoor drove her siblings to school in the morning in her mother's truck, and the children generally took the bus after school, arriving home around 3:35 p.m. On January 10, 2022, the victim died right outside Shakoor's mom's apartment where Shakoor was staying with defendant. That day, Shakoor woke up and she drove the children to school with defendant. When they came home, the couple cooked and cleaned. When the children arrived home at 3:35 p.m., defendant was in the apartment. Specifically, Shakoor and defendant were watching a movie in the main bedroom, and the children were in the living room watching television. About an hour later, Shakoor heard gunshots in the hallway. Shakoor yelled for the children to come into the main bedroom, and they hid under the bed. At the time of the gunshots, defendant was not in the apartment.

Shakoor thought that defendant left the bedroom about 15 minutes before the shooting started. He said he was going to the store and left the apartment before the gunshots. Because there were two televisions playing on high volume, Shakoor did not hear him leave the apartment. After hearing the gunshots, Shakoor looked outside the apartment and saw the victim lying on the ground surrounded by people.

Within minutes of the shooting, defendant was observed on video walking out of the apartment building, and he never returned to the apartment. Shakoor also identified a December 30, 2021 video from Facebook that depicted defendant holding a gun. Additionally, Shakoor lied at the preliminary examination when she testified that defendant did not carry a gun. In fact, defendant bought a new 9-millimeter handgun a mere 11 days before the victim's homicide. Although Shakoor could not recall the exact number of times that she saw defendant with the gun at the apartment, she knew that he had it at least once. Defendant did not have a phone and used other people's phones to contact her.

After the shooting, Shakoor did not try to contact defendant because she had heard that "he was probably the one who had done it." A Glock case was found in her mom's apartment, but it did not belong to defendant because he kept his gun "in his pants." The jury was then apprised, through the parties' stipulation, that Shakoor received statutory use immunity. Therefore, any lies to the police or assistance to defendant in deleting text messages could not be used against her.

On cross-examination, Shakoor testified that defendant previously owned a gun that he referred to as a "5 7," but he obtained the Glock instead. Yet, defendant never mentioned shooting anyone. And, although defendant and the victim had "tussles," they were never physical altercations.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first alleges that there was insufficient evidence of identification to support defendant's first-degree murder conviction. We disagree.

In *People v Baskerville*, 333 Mich App 276, 282-283; 963 NW2d 620 (2020), this Court addressed challenges to the sufficiency of the evidence:

> We review de novo a challenge to the sufficiency of the evidence. When ascertaining whether sufficient evidence was presented at trial to support a conviction, we must "review[] the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. All conflicting evidence, and any reasonable inferences that may be drawn from that evidence, must be resolved in favor of the prosecution. [Citations omitted.]

Circumstantial evidence and reasonable inferences arising from the evidence constitutes satisfactory proof of the crime's elements. *People v Smith*, 336 Mich App 297, 303; 970 NW2d 450 (2021) (citation omitted). The inferences to be drawn from the evidence and the appropriate weight of those inferences presents an issue for the jury, not the appellate court. *Id*.

Identity "is always an essential element in a criminal prosecution[.]" *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "[P]ositive identification by witnesses may be sufficient to support a conviction . . . ." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). The credibility of the identification testimony presents an issue for the trier of fact that the appellate court does not decide anew. *Id*.

In the present case, Norris testified that she drove the victim to an apartment complex to meet with a friend. They waited in the parking lot until Norris had to leave for her son's doctor appointment. Norris questioned whether it was safe for the victim to leave. She was concerned about the cold weather and about an incident that occurred a week earlier. The victim advised that the only person that raised any concern was defendant, and the victim had not seen defendant in a while. The victim proceeded into the apartment building wearing headphones and looking down at his phone. Norris heard the gunshots, saw defendant with a black gun, and saw the victim fall. Norris testified that she "locked eyes" with defendant, and he began to shoot at her. Although defendant did not successfully fire at Norris and her son, he damaged her minivan's driver's side mirror. Norris frantically backed out her minivan and called 911. She gave a detailed account of the event to the operator, noting the apartment location, the victim's name, defendant's name, a description of defendant, and other pertinent information such as a description of defendant's gun.

Shakoor testified that the victim's shooting occurred right outside of her mother's apartment door and that defendant was present in the apartment before the shooting. Approximately 15 minutes before the shooting, defendant advised that he was going to the store. Although Shakoor was unaware of the exact time that defendant left the apartment, he was

recorded on video leaving the apartment building shortly after the shooting. Defendant had a gun similar to that described by Norris.

If believed by the jury, Norris's eyewitness identification of defendant as the shooter alone was sufficient to prove identity. Moreover, that evidence was coupled with the circumstantial evidence of a feud between defendant and the victim, defendant's occupancy of the apartment in the near vicinity of the victim's shooting, defendant's possession of a gun that was similar to the shooter's weapon, and defendant's departure from the apartment building within minutes of the shooting. Together, the evidence presented at trial was sufficient to establish defendant's identity of the perpetrator. *Smith*, 336 Mich App at 303; *Davis*, 241 Mich App at 700.

Defendant, however, contends that Norris's inconsistencies and "fabrications" and law enforcement's failure to fully investigate other potential suspects[2] reflects that there was a "rush to judgment." During trial, Norris acknowledged that she failed to identify defendant in a photographic lineup. However, she attributed her misidentification to her "state of mind" within hours of the shooting. Norris further explained that three of defendant's characteristics were shared by the person she identified. And, although Norris contended that she was aware of defendant through his presence at a youth center and through his probation officer, that information was incorrect. Nevertheless, Norris was steadfast in her identification of defendant as the shooter at trial and emphasized the information that she provided the 911 operator immediately after the shooting. The jury heard Norris's 911 call, was aware of her disparate identification testimony, and convicted defendant of first-degree premeditated murder. We must view this evidence in the light most favorable to the prosecution and resolve all conflicts in the evidence in favor of the jury verdict. *Baskerville*, 333 Mich App at 282-283. Accordingly, there was sufficient evidence to support defendant's identification as the shooter, and he has failed to show entitlement to appellate relief.

### III. ADMISSION OF OTHER-ACTS EVIDENCE

Defendant contends the trial court abused its discretion by admitting other-acts evidence including audio messages of his threats to beat up the victim and correspondence and photographs of a gun. We disagree.

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). A decision on a close evidentiary question generally cannot constitute an abuse of discretion. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Under MRE 103(a), "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party[.]"

---

[2] Contrary to defendant's allegation, the police made contact with individuals in the area of the shooting as well as individuals with whom the victim communicated and eliminated other potential suspects.

-6-

MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts. Such evidence may, however, be admissible for other purposes under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Other-acts evidence may be admitted if it is offered for a proper purpose under MRE 404(b), the evidence is relevant, the probative value of the evidence is not substantially outweighed by unfair prejudice, and, upon request, a limiting instruction may be read to the jury. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993). "Other-acts evidence is logically relevant if two components are present: materiality and probative value." *People v Denson*, 500 Mich 385, 401; 902 NW2d 306 (2017). Materiality means that other-acts evidence must be related to any fact that is of consequence. *Id*. And evidence is probative if it makes the existence of a consequential fact more probable than it would be without the evidence. *Id*. Moreover, "[e]vidence is not unfairly prejudicial under MRE 403 merely because it damages a party's case." *People v Buie*, 298 Mich App 50, 73; 825 NW2d 361 (2012). "Rather, undue prejudice refers to an undue tendency to move the tribunal to decide on an improper basis." *Id*. (quotation marks and citation omitted.) Finally, the improper admission of other-acts evidence does not provide a ground for reversal unless the error was outcome determinative. *Id*. at 396.

When the prosecution filed its motion, it attached the Facebook message exchanges between defendant and the victim arguing over the victim's relationship with defendant's aunt and defendant's repeated threats to assault or hurt the victim. Additionally, the prosecution sought to admit evidence of the black Glock gun that defendant acquired shortly before the shooting. The prosecution argued that this evidence was admissible to show motive, identity, and intent.

Defendant objected that the evidence of the gun did not establish identity because he simply traded his other gun for the 9-millimeter, which was a common handgun. Moreover, the messages were substantially more prejudicial than probative because they were undated, "incomplete[,] and out of context." The messages reflected an intent to "fist fight," not a threat to use "a gun, knife, or any weapon beyond fists."

After a hearing, the trial court ruled that the prosecution offered the evidence for a proper purpose – identification. The trial court ruled that the proposed evidence was relevant and not unfairly prejudicial. The trial court granted the motion.

At trial, the court instructed the jury about the proper use of other-acts evidence:

> You have heard evidence that was introduced to show that Defendant committed acts or improper acts for which he is not on trial. If you believe this

-7-

evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that Defendant had a reason to commit the crime and/or that Defendant specifically meant to kill [the victim] and/or who committed the crime that Defendant is charged with. You must not consider this evidence for any other purpose.

For example, you must not decide that it shows that Defendant is a bad person or that he is likely to commit crimes. You must not convict Defendant here because you think he is guilty of other bad conduct.

We conclude that the trial court did not abuse its discretion by admitting the communications between defendant and the victim. Initially, we note that defendant denied committing the murder, putting all of the elements of the charged offenses at issue. *VanderVliet*, 444 Mich at 78. And, to the extent that defendant challenges his own statements threatening the victim, a prior statement by a defendant "does not constitute a prior bad acting coming under MRE 404(b) because it is just that, a prior statement and not a prior bad act." *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989), citing *People v Goddard*, 429 Mich 505, 518; 418 NW2d 881 (1988). Such prior statements are properly admitted if they are relevant and if their probative value is not substantially outweighed by the danger of unfair prejudice. *Goddard*, 429 Mich at 515. Here, defendant's prior statements in which he threatens to hurt or assault the victim for having a relationship with defendant's aunt and lying to defendant about it are clearly relevant to his state of mind and motive. Further, the probative value of defendant's threats directed at the victim was not substantially outweighed by the danger of unfair prejudice. To the extent that defendant's messages mentioned assaulting another, such evidence fell within the ambit of MRE 404(b); however, any error in its admission was harmless. First, Shakoor, who testified at trial, confirmed that defendant and the victim tussled but did not engage in a physical fight. Second, Norris expressed concern for the victim's safety when she dropped the victim off at the apartment building and the victim told Norris that he only had a conflict with defendant.

Addressing the messages, photos, and video of the 9-millimeter gun, they demonstrated that defendant acquired the potential means to commit the shooting eleven days before it occurred. See e.g., *People v Hall*, 433 Mich 573, 584-585; 447 NW2d 580 (1989). There is no dispute that five 9-millimeter Luger caliber fired cartridge cases were found in the area of the victim's body. Regardless, Shakoor testified that she recalled seeing the gun when defendant was staying with her at her mother's apartment, and, even if error had occurred, which it did not, it would have been harmless.

IV. MEDICAL EXAMINER MANNER-OF-DEATH TESTIMONY

Lastly, defendant contends that the admission of the medical examiner's manner-of-death testimony improperly invaded the role of the jury. We disagree.

To preserve an issue for appellate review, it must be raised, addressed, and decided by the trial court. *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022). In the trial court,

defendant did not object to the medical examiner's testimony or admission of his report premised on a violation of MRE 702 or an invasion of the jury's role. This issue is unpreserved.[3]

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *Chelmicki*, 305 Mich App at 62. A decision on a close evidentiary question generally cannot constitute an abuse of discretion. *Thorpe*, 504 Mich at 252. Under MRE 103(a), "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party[.]"

Although constitutional questions are reviewed de novo, the appellate court "reviews the effect of an unpreserved constitutional error under the plain-error standard." *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). Unpreserved evidentiary errors are reviewed for plain error affecting the defendant's substantial rights. *People v Fackelman*, 489 Mich 515, 538; 802 NW2d 552 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

"Once a defendant demonstrates outcome-determinative plain error, an appellate court must exercise its discretion in deciding whether to reverse." *Fackelman*, 489 Mich at 542. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks and citation omitted). We conclude that defendant failed to demonstrate plain error affecting his substantial rights arising from this unpreserved issue.

Dr. Patrick Hansma, forensic pathologist and medical examiner, testified that he was required by state statute to investigate types of death and perform autopsies. Specifically, he was obligated as the medical examiner to determine cause and manner-of-death. This was fulfilled by performing an autopsy, a systematic surgical procedure performed on a dead body with an external exam and internal dissection to search for evidence of trauma or natural disease and explain the death. After delineating his education, work history, and prior testimony as an expert in court proceedings, the prosecutor moved to qualify Dr. Hansma as an expert in the field of forensic pathology. Defense counsel did not object to the admission of Dr. Hansma's testimony but responded, "So stipulated. No Voir Dire."

---

[3] The prosecution contends that this issue was waived because defense counsel stipulated to the admission of the autopsy report, which also reflects that the victim's manner of death was homicide and which the prosecutor stated he was "going to move by stipulation . . . for admission of" the exhibit. Because the transcript does not reflect defense counsel responding to the prosecutor's statement, we opt to address the issue as unpreserved error.

On January 19, 2022, Dr. Hansma performed an autopsy on the victim at Sparrow Hospital. During the autopsy, Dr. Hansma prepared a report documenting all medical findings. The report was admitted into evidence "by stipulation" of the parties.

Dr. Hansma testified regarding the mechanism of death which is the physiologic event that brought about death. Because of internal hemorrhaging with blood in the victim's chest and the inability to efficiently pump blood to the brain and other organs, the victim died of organ shutdown. Dr. Hansma opined that the cause of the victim's death was multiple gunshot wounds. The manner-of-death was homicide. There was no objection to the cause and manner-of-death testimony by Dr. Hansma.

Dr. Hansma's testimony reflected that he identified the various gunshot wounds suffered by the victim, the injuries that were life threatening, and the cause and manner-of-death. Defense counsel did not object to the cause and manner-of-death testimony. Indeed, MCL 52.205 governs the county medical examiner's responsibilities, including determining the cause and manner-of-death:

> (1) If a county medical examiner has notice that the body of an individual who may have died in a manner described in section 3 has been found within the county medical examiner's county, the county medical examiner shall take charge of the body. If after examining the body and investigating the cause and manner of the death the county medical examiner considers a further examination necessary, he or she may cause the body to be removed to the public morgue. . . . If there is no public morgue, the body may be removed to a private morgue designated by the county medical examiner.
>
> * * *
>
> (3) The county medical examiner may perform or direct to be performed an autopsy and shall carefully reduce or cause to be reduced to writing each fact and circumstance tending to show the condition of the body and the cause and manner of death, and shall include in that writing the name and address of each individual present at the autopsy. The individual performing the autopsy shall subscribe the writing described in this subsection.

Thus, when Dr. Hansma testified regarding the cause and manner of the victim's death, it was in accord with his statutory obligation.

Additionally, the Michigan Rules of Evidence allow for the admission of expert testimony even if it embraces the ultimate issue:[4]

---

[4] The Michigan Rules of Evidence in 2024. Defendant's trial occurred in February 2024. We rely on the rule content in effect at the time of trial.

MRE 702. A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

MRE 703. An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. The facts or data must be in evidence – or, in the court's discretion, be admitted in evidence later.

MRE 704. An opinion is not objectionable just because it embraces an ultimate issue.

In *People v McFarlane*, 325 Mich App 507; 926 NW2d 339 (2018), the defendant was convicted, following a jury trial, of first-degree child abuse involving his nine-week-old infant, KM. The defendant challenged the admission of expert testimony from Dr. Sarah Brown, a child abuse pediatrician, addressing KM's injuries. Although this Court disagreed with the terminology Brown employed in her testimony, this Court ultimately declined to grant appellate relief, concluding that plain error was not established:

Defendant next argues that the trial court erred when it allowed Brown to testify that she diagnosed KM with "definite pediatric physical abuse." He maintains that Brown's testimony amounted to an opinion that he was guilty. This Court generally reviews a trial court's decision to allow the admission of testimony for an abuse of discretion. However, it is an abuse of discretion to allow testimony that is inadmissible as a matter of law.

This Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence. This Court also reviews de novo constitutional questions, such as whether the trial court improperly allowed a witness to invade the province of the jury. Because defendant did not object to Brown's testimony on this basis before the trial court, this Court's review is limited to determining whether there was a plain error that affected defendant's substantial rights. To establish plain error that warrants relief, the defendant must show that the error was plain or obvious and affected the outcome of the lower court proceedings.

B. ANALYSIS

A trial court may permit testimony by a "witness qualified as an expert by knowledge, skill, experience, training, or education" if the court determines that "scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue . . . ." MRE 702. An expert may offer an opinion at trial if his or her testimony "is based on sufficient facts or data," if the testimony "is the product of reliable principles and methods," and if the witness "has applied the principles and methods reliably to the facts of the case." MRE 702. The trial court must also ensure that the expert's testimony is relevant. Even when an expert's testimony is relevant, it remains subject to the limits imposed by MRE 403.

This case required expert medical testimony because it was beyond the ken of ordinary persons to evaluate the medical evidence and assess the nature and extent of KM's injuries, the timing of those injuries, and the possible mechanisms of injury implicated by the medical evidence. Moreover, if an expert's opinion is otherwise admissible, it does not become objectionable merely because "it embraces an ultimate issue to be decided by the trier of fact." Nevertheless, there are limits on an expert's authority to offer an opinion that embraces an ultimate issue:

> Although the ultimate issue rule no longer stands in the way of expert testimony stating opinions on crucial questions to be decided by the trier of fact, it is important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion. In the former case, the claim is that the province of the judge is invaded, while in the latter, the contention is that the province of the jury is invaded. [*People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980).]

As our Supreme Court explained . . . when a jury has been confronted with one of society's most heinous offenses, there is a significant danger that the jury will give extra weight to an expert's testimony:

> "The use of expert testimony in the prosecution of criminal sexual conduct cases is not an ordinary situation. Given the nature of the offense and the terrible consequences of a miscalculation—the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented—appropriate safeguards are necessary. *To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat*."

This case involved whether [the] defendant intentionally injured KM by inflicting trauma to her brain. Because there was no external evidence of injury, her injuries involved a classic diagnosis of shaken-baby syndrome or abusive head trauma. The American Academy of Pediatrics adopted the term "abusive head

-12-

trauma" in 2009 and defined it to mean the "constellations of injuries that are caused by the directed application of force to an infant or young child, resulting in physical injury to the head and/or its contents." Thus, by definition, the diagnosis involves trauma caused by human agency, which the American Academy of Pediatrics labels abusive.

It remains the prevailing view in the medical community that there are "some internal findings that are highly correlated with abusive head trauma . . . ." In keeping with this view, a physician may employ a differential diagnosis and conclude that the child's injuries were the result of abusive head trauma:

> [T]he consensus is that no single finding or combination of findings is pathognomonic for abusive head trauma. Rather, a differential diagnosis must be made based upon the totality of the circumstances in each individual case. A congruence of multiple findings, each of which independently correlates with abusive head trauma, narrows the field of potential diagnoses significantly, however, and absent a clinical history of accidental trauma or evidence of a disease process consistent with those findings, a diagnosis of abusive head trauma may be made.

A minority of physicians and other scientists have identified changes in the understanding of the biomechanics of shaking and evidence that subdural hematomas, retinal hemorrhages, and brain swelling are not unique to head trauma caused by human agency. For that reason, those physicians and scientists believe it is impossible to reliably conclude that a particular child's injuries were the result of inflicted trauma. Although there is a debate about the reliability of such a diagnosis, courts continue to allow experts to offer the diagnosis on the ground that it is accepted and reliable.

Our Supreme Court has recognized the debate within the medical community about the reliability of a diagnosis of shaken-baby syndrome or abusive head trauma. It has not, however, considered whether there are any limits on an expert's ability to diagnose abusive head trauma. Still, it has provided general guidance on the limits of expert testimony in analogous circumstances.

As a result of the danger that a jury might give too much weight to an expert's opinion on a matter involving an ultimate issue, our Supreme Court has imposed strict limits on expert testimony that "comes too close" to findings that are left exclusively to the jury. For example, in cases involving criminal sexual conduct, an expert may not offer an opinion that the alleged victim had in fact been sexually abused, may not offer testimony that vouches for the victim's veracity, and may not offer an opinion that the defendant is guilty. The same is true for expert testimony on "battered woman syndrome": the expert may not opine that the complainant was in fact a battered woman, may not testify that the defendant is guilty, and may not comment on the complainant's veracity. Although an expert may be necessary to explain characteristics of gang culture, the expert may not offer

-13-

an opinion that a particular gang member acted in conformity with character traits commonly associated with gang members and may not offer an opinion on the defendant's intent when he acted.

It is necessary for an expert to testify about the types of injuries typically observed with head trauma in children and to describe the possible mechanisms of injury involved. Further, unlike the case with a diagnosis of sexual assault based on the emotional state and statements of the complainant, a diagnosis that a child's head injuries were not accidental may be made on the basis of physical examination and scientific evidence rather than solely on the history provided by the complainant. Accordingly, contrary to [the] defendant's contention on appeal, a physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease because a jury is unlikely to be able to assess the medical evidence. Expressing an opinion that the trauma was inflicted or not accidental does not impermissibly invade the province of the jury because the expert is not expressing an opinion regarding the defendant's guilt or whether the defendant had a culpable state of mind, which the expert may not do. Instead, the expert is interpreting the medical evidence and offering the opinion that the trauma was caused by human agency, and the jury is free to reject that opinion on the basis of the evidence adduced at trial, including a contrary opinion by another expert.

Notwithstanding the propriety of a diagnosis of inflicted trauma, we conclude that in cases involving allegations of abuse, an expert goes too far when he or she diagnoses the injury as "abusive head trauma" or opines that the inflicted trauma amounted to child abuse. The ordinary understanding of the term "abuse"—as opposed to neglect or carelessness—implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma. An expert may not offer an opinion on the intent or criminal responsibility of the accused.

Brown—who was admitted as an expert in child abuse pediatrics—testified generally about the nature of KM's condition and injuries. She described the possible mechanisms that could cause the injuries and then stated that KM's injuries were inflicted rather than accidental or the result of her preexisting condition. Brown did not limit her diagnosis to her belief that KM's injuries were best explained as inflicted or not accidental; she opined that this case involved a "definite case of abusive head trauma." It was also evident from her testimony that "abusive head trauma" meant child abuse. She repeatedly told the jury that KM's injuries were "caused by definite pediatric physical abuse," and she stated that "we know that abusive head trauma" causes these injuries because people confess to hospital staff and investigators or other family members after inflicting the injuries. She also agreed that KM had suffered previous abuse even though she was only nine weeks old. She further told the prosecutor that she was correct when the prosecutor noted that Brown looked at the totality of the circumstances before concluding that this case involved "child abuse."

Brown's testimony that KM's injuries were caused by "abusive head trauma" or otherwise amounted to "child abuse" strongly suggested that it was her opinion that whoever inflicted the injuries on KM did so with culpable state of mind; that is, her testimony plainly implicated whether defendant "knowingly or intentionally" caused serious physical harm to KM within the meaning of MCL 750.136b(2). Because Brown was in no better position than the jury to assess the intent that defendant had when he acted, her belief that his actions were abusive or amounted to child abuse were irrelevant and inadmissible as a matter of law. Consequently, the trial court plainly erred to the extent that it allowed Brown to use the phrase "abusive head trauma" to label her diagnosis rather than a less prejudicial label, such as inflicted or nonaccidental head trauma, and erred by allowing her to agree that KM's injuries amounted to "child abuse." However, a plain error will not warrant relief unless the defendant demonstrates that the error affected the outcome of the lower court proceedings.

Although Brown opined that KM's injuries were caused by definite pediatric physical abuse, she conceded that she could not say what actually happened to KM. She also testified that there were some people who felt that abusive head trauma was misdiagnosed. Moreover, defense counsel called three witnesses who testified that they did not agree with Brown's diagnosis: Julie Mack, M.D., who was a pediatric radiologist; Douglas Smith, M.D., who was a retired pathologist; and Joseph Sheller, M.D., who was a pediatric neurologist. The experts informed the jury that they did not believe that a medical professional could diagnose abuse. Mack testified that the medical records might give rise to a suspicion of abuse but opined that a medical professional cannot diagnose abuse. Smith also testified that the diagnoses of shaken-baby syndrome or abusive head trauma were founded on flawed studies and that there was great controversy over whether a medical professional could make such diagnoses. Sheller similarly testified that the presence of the symptoms seen in KM would cause a reasonable pediatrician to be concerned about the potential for abuse, but that a suspicion does not mean abuse actually occurred. Sheller stated that the symptoms at issue were not an absolute sign of abuse. Given this testimony, the jury was well aware of the limits on Brown's opinion. Any prejudice occasioned by her characterization of the acts was minimal.

Although the prosecutor mentioned in her closing argument that Brown had characterized the symptoms as having been caused by abuse, she did not argue that the jury should rely on Brown's opinion when deciding whether [the] defendant had the requisite intent to establish first-degree child abuse. Instead, she argued that KD's account of events, the severity of the injuries, and [the] defendant's subsequent actions tended to prove defendant's guilt.

There was evidence that KM became symptomatic while in [the] defendant's care, and KD testified that she saw [the] defendant shake KM at around that same time. The timing and eyewitness account permitted an inference that KM manifested her symptoms at that time because they were inflicted at that moment. A detective also reported that KD had reported that she had heard [the] defendant

yell "shut up" to KM. KD stated that [the] defendant punished her when she cried at a time when he wanted to play video games. The evidence tended to suggest that [the] defendant could become angry and frustrated by crying children. Brown also testified that KM's injuries were consistent with having been violently shaken. There was also testimony that [the] defendant warned KD not to tell anyone and threatened to come after a neighbor if she or her husband said anything wrong about his statements to investigators. [The d]efendant's statements suggest that he was conscious of his guilt.

The totality of the evidence strongly supported that [the] defendant became angry with KM, violently shook her out of frustration, and caused the injuries at issue. Given the strength of the evidence, to the extent that the trial court plainly erred by allowing Brown to use the labels "abusive head trauma" and "child abuse," we find it unlikely that the error affected the outcome of the trial. Therefore, the error does not warrant relief. [*McFarlane*, 325 Mich App at 517-527 (citations omitted).]

Accordingly, "experts are permitted to draw and testify regarding conclusions that encompass a question to be decided by the jury, so long as the expert does not purport . . . to draw a legal conclusion." *People v Ackley (On Remand)*, 336 Mich App 586, 595; 970 NW2d 917 (2021). "Thus, where it is possible to draw a medical diagnosis based on a physical examination, as opposed to a complainant's self-reporting, an expert is fully permitted to testify that, in their opinion, a particular injury was not accidentally self-inflicted." *Id.*

In *People v Doan*, 141 Mich App 209, 214; 366 NW2d 593 (1985), this Court clarified that expert opinion may embrace an ultimate issue, but the witness may not invade the court and the jury's decisions regarding applicable law:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." There is nothing wrong with a psychiatrist's or psychologist's testifying that defendant was or was not insane when he performed the act. However, an expert's opinion as to the applicable law of criminal responsibility or insanity is of no aid to the jury and could possibly confuse them in light of their duty to apply the law as explained by the judge at the end of the case. "[I]t is the exclusive responsibility of the trial judge to find and interpret the applicable law." While the expert may give opinions, even though couched in legal language which "embraces an ultimate issue," MRE 704, the witness's function does not extend to enlightening the court or jury on matters of law. The distinction has been consistently followed by the courts of this state. [*Id.* (citations omitted).]

Additionally, in *People v Drossart*, 99 Mich App 66, 79-80; 297 NW2d 863 (1980), this Court addressed the invasion of the province of the jury:

[A] witness is not permitted to tell the jury how to decide the case. Thus, a witness is prohibited from opining on the issue of a party's negligence or nonnegligence, capacity or noncapacity to execute a will or deed, simply versus

gross negligence, the criminal responsibility of an accused, or his guilt or innocence.

The reason for this rule is that where a jury is capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury. The same rule applies when it is an expert opinion being offered on a matter equally within the scope of a jury's common knowledge. However, where the expert's particular training and experience in a special field of activity – such as the study of mental diseases - - is largely unfamiliar to the jury, his opinion can be submitted for the jury's consideration. [*Id.* (citations omitted).]

In this case, defendant contends that the medical examiner's testimony regarding manner-of-death addressed the "ultimate issue," and, therefore, invaded the province of the jury. In making this argument, defendant does not identify what the ultimate issue is.

Defendant was charged with open murder and convicted of first-degree premeditated murder. "[T]o secure a conviction of first-degree premeditated murder, the prosecution must establish beyond a reasonable doubt a '[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.' " *People v Oros*, 502 Mich 229, 239-240; 917 NW2d 559 (2018) (citation omitted). The elements of first-degree murder consist of the intentional killing of a human with premeditation and deliberation. *Id.* Dr. Hansma's testimony regarding manner-of-death did not remove the ultimate issue from the jury, specifically, whether defendant was guilty of first-degree murder. Instead, the doctor merely proffered that the victim was killed. The victim suffered six gunshot wounds, and while multiple gunshot wounds were life threatening, the gunshot wound to the chest would have rendered him nearly immediately incapacitated in light of the blood's accumulation in the chest that prevented the blood from traveling to the brain and other organs. Dr. Hansma did not address the ultimate question of whether defendant was the perpetrator of the killing. Further, Dr. Hansma was not questioned regarding whether the victim provoked defendant or whether defendant had a defense to the killing. Additionally, Dr. Hansma did not address whether defendant had the requisite state of mind. We conclude that Dr. Hansma did not invade the province of the jury by providing manner-of-death testimony.

Defendant failed to demonstrate plain error affecting his substantial rights from the admission of manner-of-death testimony. Dr. Hansma merely opined that a homicide occurred, i.e., a killing of the victim. This did not invade the jury's province to decide whether defendant was the perpetrator, whether he had the requisite intent, and whether there were any applicable defenses to the killing.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica

-17-